# NIELS F. NIELSEN v. MUTUAL SERVICE CASUALTY INSURANCE COMPANY.[1]

December 3, 1954.

No. 36,286.

[1]Reported in 67 N. W. (2d) 457.

*Warren B. King* and *Clark MacGregor,* for appellant.

*Dorsey, Colman, Barker, Scott & Barber* and *Horace L. Hitch,* for respondent.

KNUTSON, JUSTICE.

This is an action to recover on an automobile collision insurance policy. In May 1950, plaintiff purchased a Chevrolet automobile from Downtown Chevrolet Company in Minneapolis. His son Harold had selected the automobile, but Harold, being a minor, could not purchase the car in his own name. The invoice and conditional sales contract were made out to plaintiff. The title was registered in plaintiff's name, and the original insurance was issued to him. The down payment was $1,385, of which Harold paid $1,300. Plaintiff paid the balance of $85. The installments falling due in June, July, and August were paid by Harold. In August Harold entered the armed services. Thereafter, the September and October installments were paid by plaintiff, and in October he paid up the balance of the contract in order to save any further interest.

After the car was purchased it was driven by plaintiff; his sons, Harold, David, and Leonard; and his daughters, although Harold drove it most of the time. When the balance of the contract was paid, the insurance on the car was cancelled, and the car was not thereafter driven until Harold came home on leave. Plaintiff had a Nash automobile which was used by the entire family. In December Harold came home on leave and wanted to drive the Chevrolet. Plaintiff wanted it covered by insurance if it was to be driven. He tried to contact his own insurance agent but could not locate him.

He then was introduced to Lewis Herfindahl, who was one of defendant's agents, by a friend of the family. Plaintiff and his sons Harold and David went to the home of Mr. Herfindahl where plaintiff signed the application for insurance and obtained the coverage here involved.

The application contains three questions, among others, that are involved in this litigation. These questions and the answers written on the application are as follows:

"Except with respect to bailment lease, conditional sale, mortgage or other encumbrance, is the named insured the sole owner of the automobile? yes

\* \* \* \* \*

"Is any frequent operator of the described automobile under 23 years of age? yes

"List those who in addition to the Named Insured will frequently drive the described automobile.

| "Name of Driver | Age | Relationship to Insured | % of Total Driving Done |
|---|---|---|---|
| "David Nielson | 16 | son—Father always with him | 2% |
| "Harold Nielson | 19 | son—in service wears uniform | less than 1% |

"Have you or any of the frequent drivers listed above: (a) Any physical defects? No (b) Ever been arrested for drunken or reckless driving or had his driver's license suspended or revoked? No"

While there is some dispute in the evidence, the jury could find that plaintiff exhibited the registration card and conditional sales contract to Herfindahl and informed him of facts as to ownership of the car. The evidence will be considered more in detail later in the opinion.

Harold was again home in January for a ten-day leave, during which time he drove the car most of the time, although David also drove it. During Harold's absence between leaves, the car was

driven by plaintiff and other members of the family. His next leave was in April. When he left for camp at that time, he took the Chevrolet with him to Kentucky and, while there, was involved in a collision out of which this litigation arose. Defendant denied liability on the ground that there had been material misrepresentations in the application which avoided the policy. The jury returned a verdict for plaintiff, and defendant appealed from an order denying its motion for judgment nothwithstanding the verdict or a new trial and from the judgment.

■ The applicable and controlling statute in this case is M. S. A. 60.85, which reads:

"No oral or written misrepresentation made by the assured, or in his behalf, in the negotiation of insurance, shall be deemed material, or defeat or avoid the policy, or prevent its attaching, unless made with intent to deceive and defraud, or unless the matter misrepresented increases the risk of loss."

In construing this statutory provision in Johnson v. National L. Ins. Co. 123 Minn. 453, 456, 144 N. W. 218, 219, we said:

"* * * a material misrepresentation, made with intent to deceive and defraud, avoids the policy. A material misrepresentation, not made with intent to deceive or defraud, does not avoid the policy, unless by the misrepresentation the risk of loss is increased. If a material misrepresentation increases the risk of loss the policy is avoided, regardless of the intent with which it was made. An immaterial representation, though made with intent to deceive and defraud, does not avoid the policy."[2]

This construction of our statute has since been followed in many cases. See, for instance, Mack v. Pacific Mut. L. Ins. Co. 167 Minn. 53, 208 N. W. 410; Schaedler v. New York L. Ins. Co. 201 Minn. 327, 276 N. W. 235.

[2]For a discussion and criticism of this statement, see Prosser, *Innocent Misrepresentation of Health in Insurance Applications*, 28 Minn. L. Rev. 141, 158.

■ In Mack v. Pacific Mut. L. Ins. Co. we said (167 Minn. 57, 208 N. W. 412) :

"* * * Usually it is for a jury to decide whether a misrepresentation has in fact been made, whether it is material, whether it is made with intent to deceive and defraud or whether the matter misrepresented, in fact, increases the risk of loss."

■ The general rule that, where there is an ambiguity, the language chosen by the insurer should be construed against it applies as well to an application for insurance as to the policy itself. Villiott v. Sovereign Camp of Woodmen of World, 145 Minn. 349, 177 N. W. 356; Holtorf v. Rochester Farmers Mut. F. Ins. Co. 190 Minn. 44, 250 N. W. 816; 9 Dunnell, Dig. (3 ed.) § 4659.

■ Where a representation relates to future conduct, events to take place in the future, or things not susceptible of present, actual knowledge, they amount to statements of intention, opinion, or belief. As to such representations, the good faith of the insured is the criterion of truth for they can be false only when the intention, opinion, or belief, as declared, is not honestly entertained. Vance, Insurance (2 ed.) § 107.

■ With these rules in mind and viewing the evidence in the light most favorable to the verdict as we must on appeal, we have no difficulty with the first two questions on the application quoted above. The jury could find that, at the time this application was prepared and signed, the parties considered plaintiff the owner of the Chevrolet, with a contingent right in Harold that he could acquire the car, upon payment of the amount which his father had advanced, when he had finished his service with the army. Plaintiff not only paid a substantial part of the purchase price but the title was in his name. The entire family used the car at times. It is true that Harold was to become the owner of the car when he paid his father the amount he had invested, but the evidence will support a finding that until that was done the father was the owner of the car. At least, the understanding between father and son was so indefinite that the jury could well have found that any representations as to the ownership were not made with an intent to defraud or deceive.

The facts respecting those who were to drive the car were disclosed to the agent for the insurer, and the jury could find, on the state of the record before us, that, even if Harold had a part ownership of the car, that fact did not increase the risk of loss for the reason that, whoever owned the car, it would have been driven by the same persons.

Much the same can be said with respect to the question relating to the percentage of driving which would be done by Harold. The evidence is not at all satisfactory on this subject, and the testimony of Mr. Herfindahl, to say the least, was evasive. It is the claim of plaintiff that he gave the true facts to Herfindahl and that it was he (Herfindahl) who estimated the percentage of time that Harold would drive the car. Harold was in the armed services at the time this application was made. It is reasonable to suppose that both plaintiff and Harold were of the opinion that Harold would drive the car only during short intervals when he was home on leave. The question itself is ambiguous. Whether the answer should have been based on an estimate of past driving or on anticipated future driving and, if the latter, over what period of time does not appear. The truth of the answer to this question must be determined in the light of the opinion or intention of the insured and his sons at the time the statement was made. Viewed in that light, the jury could well find that the statement was not untrue. It was also for the jury to say whether the statement, if untrue, was made with an intent to deceive or defraud or whether it increased the risk of loss.

We have more difficulty with the third question. It is admitted by plaintiff that, at the time the application was signed, Harold's driver's license had been twice revoked for reckless driving. At the time the application was signed, plaintiff knew of one of these revocations. The evidence as to what was told the insurance agent is far from conclusive. Plaintiff testified as follows:

"Q. Mr. Nielsen, you remember this part of the application that had to do with previous arrests for drunken or reckless driving or suspension of driver's license?

"A. Yes.

"Q. You told Mr. Herfindahl that neither you or either of the boys had ever had his license suspended or revoked, or had been convicted of reckless driving?

"A. I told him in the last fifteen years I hadn't had my driver's license revoked.

"Q. Did you tell him that neither of the boys had had his license suspended or revoked?

"A. I don't think he asked me about Harold, if he had his license revoked.

"Q. Do you remember that Item 13 states, in part, 'Have you or any of the principal drivers listed above ever been arrested for reckless driving or had his driver's license suspended or revoked?' I will ask you to look at that and see if the answer after that is 'No'?

"A. I don't know. Where is that?

"Q. Item 13, Mr. Nielsen, about previous suspension or revocation of driver's license. And the question is directed to you and your boys, and the answer was 'No'?

"A. Well, yes.

"Q. And you signed the application?

"A. Yes, I did.

"Q. Knowing that the answer to that question was 'No'?

"A. Yes, I signed knowing that.

"Q. And you knew of course at that time—had Harold ever had a driver's license suspended?

"A. Yes.

* * * * *

"Q. How many times had Harold had his driver's license suspended for careless or reckless driving?

"A. Once I guess.

"Q. Was that in 1947 or 1948?

"A. I can't remember the date.

"Q. Do you recall now that he twice had it suspended for careless driving?

"A. No, I don't. Once is all I recall.

"Q. And you knew that at the time this application was made?

"A. Yes.

"Q. And I believe, as you testified, you didn't tell Mr. Herfindahl about it?

"A. He didn't ask me if Harold had his license suspended.

"Q. But you signed the application.

"A. Yes.

"Q. In which it states that neither you nor the boys had ever had his license suspended.

"A. I didn't read that paragraph."

Harold, who was called as a witness for defendant, testified:

"Q. Do you remember the questions coming up about prior suspensions?

"A. No. Nobody asked me about that. He might have asked my dad, but nobody asked me about it.

"Q. You didn't volunteer anything?

"A. Nobody asked me and I didn't tell them."

Here, again, Mr. Herfindahl was quite evasive. His testimony is as follows:

"Q. Going down to the next item, which is Item 13-B, which has to do with previous arrests and suspension of driver's license, did you ask Mr. Nielsen for information which would lead you to put an answer to that question?

"A. That question I gave in the open. 'Have you been involved in an accident the past three years,' and they would say no, and I would go on.

"Q. I asked you about the next part of it, about the suspension of the driver's license. Did you ask Mr. Nielsen that question?

"A. 'Have you been arrested for drunken and reckless driving and had your license suspended.' I would go through those questions and then I would say no, and that is the way it went on.

"Q. On this particular situation do you remember asking Mr. Nielsen that question about prior suspensions of driver's licenses?

"A. No, that is the way I do those things. Wherever they have made a statement—[A motion was then made to strike the answer as not responsive, which was granted.]

\* \* \* \* \*

"Q. Was anything said to you, Mr. Herfindahl, by Mr. Nielsen or by either of the boys to the effect that Harold had twice been picked up for some traffic offense and had his driver's license suspended?

"A. No, sir, that was never told to me."

On cross-examination, Herfindahl testified:

"Q. Oh, let's pick out one. 'Have you or any listed driver of the automobile been involved in an accident during the past three years,' and you have written 'No'. Who answered that one?

"A. I don't know whether it was the boys or the father, because the father was doing most of the answering.

"Q. The boys did some talking?

"A. They might have.

"Q. But you don't recall?

"A. The question is asked in the open now, and at any rate I didn't get any information on any arrest or anything."

In the light of the evidence the question of whether or not the misrepresentation was made with intent to deceive or defraud clearly was for the jury. We cannot hold that a misrepresentation was made with intent to deceive and defraud unless the evidence is conclusive. Sanne v. Metropolitan L. Ins. Co. 218 Minn. 181, 15 N. W. (2d) 524.

Defendant would have us hold as a matter of law that the misrepresentation here under consideration increased the risk of loss. The burden of proving that the misrepresentation increased the risk of loss rests on the insurer. Schaedler v. New York L. Ins. Co. 201 Minn. 327, 276 N. W. 235. Many of the cases involving this question are concerned with life insurance in which the alleged misrepresentation relates to an undisclosed disease or infirmity existing at the time of the application which was not disclosed to the insurer.[3]

_____
[3]See, 28 Minn. L. Rev. 141.

Defendant would have us apply the reasoning in those cases to the facts now before us. It is apparent that there is a vital distinction between the two types of cases. It is quite obvious that, where an applicant for life insurance is suffering from an incurable disease or physical infirmity which will become progressively worse and from which death will eventually follow unless some other accident or disease intervenes, this condition increases the risk of loss to the insurer. Without consideration of the facts pertaining to revocation of a driver's license, it cannot be concluded that the driver will continue to be a careless driver. A young driver may learn to be more careful as a result of the revocation of a license. As a matter of fact, it is probably safe to assume that one of the primary reasons for revocation of the license is to induce the driver to become more careful in the future. The reasons for the revocation may also be of great importance in determining whether the revocation reasonably would lead one to believe that the driver would continue to be a careless driver and therefore increase the risk of loss to the insurer. Here the evidence fails to show the facts pertaining to the revocation except that it was for reckless driving. It fails to show how long prior to the application for insurance the revocation occurred or for how long the license was revoked. Defendant's proof goes no further than to show that insurance companies consider all youthful drivers greater hazards than more mature persons, but there was no misrepresentation as far as Harold's age was concerned. Under these circumstances, we think that whether or not the misrepresentation as to the revocation of Harold's driver's license increased the risk of loss presented a question for the jury's determination.

Affirmed.