## CLARA V. LARSON

v.

## UNION CENTRAL LIFE INSURANCE COMPANY.

137 N. W. (2d) 327.

August 27, 1965—No. 39,391.

*Burns & Rossi* and *I. John Rossi,* for appellant.

*Mackall, Crounse, Moore, Helmey & Holmes* and *Clay R. Moore,* for respondent.

SHERAN, JUSTICE.

Appeal from an order of the district court denying an alternative motion for a new trial or judgment notwithstanding the verdict.

On December 12, 1955, the Union Central Life Insurance Company issued to the Minnesota State Bar Association a policy of group life insurance designed to provide coverage for members in good standing. Lawrence O. Larson qualified for insurance initially in the amount of $10,000. A certificate evidencing this coverage was issued to him on December 22, 1955, the effective date of the group policy.

On December 22, 1959, Larson obtained $10,000 additional coverage made available at that time to members of the bar association. In doing so, he filled out an application which contained certain fact representations which were fatal to the added coverage unless the insurer's failure to attach a copy of this application to the certificate delivered to Larson or to the group policy makes a difference.

A total premium covering all members was paid to the Union Central Life Insurance Company by the bar association twice yearly—on January 22 and on July 22. Contributions from members were payable semiannually on December 22 and June 22 to the bar association collecting through an agency called Group Administration, which deposited the money received in an account from which premium payments were made to Union Central.

Before June 22, 1960, Larson was current in his membership contributions. He failed to make a payment due on that date.

Routinely, Union Central sent notices to members reminding them of the dates on which semiannual contributions were expected. The practice was to send such a notice on May 22 of each year; a follow-up notice on June 22; and a "termination" notice on July 22. The "termination" notice ordinarily sent contained this statement:

"Unless your check is received within ten days your certificate will be terminated under this group contract."

The evidence establishes that the May 22, 1960, "premium notice" from Union Central was sent to Larson. It stated the amount due as of June 22, 1960, in this way:

> "Amount            $121.00 SA
> '59 Div.           6.28
> Bal. Due        $114.72"

On August 11, 1960, a check in the amount of $114.72, signed by Mrs. Clara V. Larson, was sent to Group Administration together with a Union Central form entitled "Supplementary Application for Group Insurance." This application contained the same representations with respect to health as appear in the application for additional coverage dated December 2, 1959.

Pending an investigation of the risk (prompted by a disclosure in the August 11 application that Larson had received sick benefits from another insurer), Larson was informed by Union Central through Group Administration on September 6, 1960, that his application for reinstatement was received "subject to approval by the home office," and that a medical report from his physician on a form enclosed would be needed. The report was never furnished. Larson died on October 28, 1960.

By letter dated December 22, 1960, addressed to Mrs. Larson at her home, a check in the amount of $121 payable to the estate of Lawrence O. Larson was received with a letter stating:

> "Enclosed you will find the premium which your husband remitted in the amount of $121.00 on his group insurance *that lapsed as of July 22nd,* and was never reinstated.
>
> "This money was held in an escrow account until such time as the policy had been reinstated.
>
> "The requirements for reinstatement were never completed by your husband." (Italics supplied.)

This action was instituted to recover $20,000 to which the plaintiff, Clara V. Larson, the person designated as beneficiary by the decedent, claims to be entitled. The defendant by answer contended that the insurance which would ordinarily be payable to Larson's designated beneficiary upon his death was not payable in this instance because (1) on July 22, 1960, all insurance coverage upon the life of Lawrence O. Larson terminated for failure to pay a semiannual premium when due or within a 30-day

grace period thereafter, and (2) the coverage having terminated, reinstatement was not effected as of the time of Larson's death.

The case was submitted to a jury on special interrogatories. It found that the representations made by Larson in his 1959 application for increased coverage and in the 1960 application for reinstatement were false and intended to deceive and defraud the insurer; that the true facts were of a nature to increase the risk of loss to the defendant company.[1]

The trial judge confirmed the jury's special verdict and made additional findings as permitted by Rule 49.01, Rules of Civil Procedure.[2] Judgment was ordered that plaintiff recover nothing from defendant on the theory that the policy had lapsed and reinstatement was vitiated by fraud.

Plaintiff's motion for a new trial or judgment notwithstanding the verdict was based in part on the theory that there was coverage because neither the master policy nor the certificate made provision for forfeiture upon nonpayment of membership contributions. She also contended that the misrepresentations, not being contained in an application attached either to the master policy or the certificate, could not be the basis of a defense.

■ Although it is doubtful whether the first of these claims was clearly presented to the trial court by the pleadings or the case theory adopted by plaintiff's attorney at the time of trial, the trial judge considered plaintiff's contention that the policy had never terminated as being properly before it and disposed of the contention in this way:

"The plaintiff's fourth point is that the nonpayment of the premium

---

[1] The jury found that the insurer had reinstated Larson's insurance prior to his death by certain acts and omissions. But, for reasons to be stated, these findings are not now significant.

[2] Rule 49.01, Rules of Civil Procedure, reads: "The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. * * * *If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand, the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."* (Italics supplied.) See, Ulrich v. Minneapolis Boxing and Wrestling Club, Inc. 268 Minn. 328, 129 N. W. (2d) 288.

did not forfeit the policy because there was no specific provision for forfeiture. My conclusion is that the contractual provisions must be deemed to have contemplated that premium payments were a condition precedent to the continuance of the life insurance and consequently there was no need for a specific forfeiture provision. In addition to the authorities cited by the defendant on this point the following authorities are pertinent: 6 Couch on Insurance (2nd Ed.) Section 32:55; 45 C.J.S. (2nd) 446, Ins., Section 613; and *Jackson vs. Mutual Life Insurance Company* (1911- C.C.A.P.) 186 Fed. 447. At the cited section Couch says:

" 'It is the general rule that in the case of life risks the mere non-payment of a premium when due will not of itself operate to effect a lapse of forfeiture unless it is so provided in the policy, or unless payment is made a condition precedent to the continuance of the contract.'

"In my opinion the following provisions of the master policy make it clear that the payment of the premiums was a condition precedent to the continuance of the insurance upon any individual. Paragraph 5 on the first page provides:

" '*Consideration.* This policy is issued in consideration of the payment by the policyholder of the semiannual premium due on its effective date and payment thereafter of all premiums as they become due as provided in Section D.'

"L-5 of the master policy entitled 'Rights of the Insured' provides:

" 'Each insured has a vested interest in his insurance to the extent of the aggregate amount of his contributions, if any, towards its cost. No change in or amendment of this Group Policy or any other act by the Policyholder may infringe limit, or divest any insured of such vested interest.' "

The contract documents consist of a master policy with attached amendments; certificates of individual insurance under the group policy issued to Lawrence O. Larson; and applications as defined in the master policy.[3]

The principal parties to the contract are the Union Central Life Insur-

---

[3] Section G1 of the master policy provides: "This policy, together with the Policyholder's application, a copy of which is attached hereto, [none attached] and together with the written applications, if any, of those persons who are insured under the policy, constitutes and contains the entire contract. All statements will be deemed to be representations and not warranties. * * * No

ance Company of Cincinnati, Ohio, (hereinafter called Union Central) and the Minnesota State Bar Association, described as the policyholder. The broad agreement of Union Central is to insure the life of any person who was a member in good standing of the Minnesota State Bar Association on the effective date of the policy (December 22, 1955) and who made proper application for such insurance and entered into arrangements with the policyholder required for its maintenance. Lawrence O. Larson, having met these requirements, became an "insured member" with the power to designate the person to whom benefits would be payable upon his death—in this case Clara V. Larson, his wife.

The obligation of the company initially was to pay upon receipt of due proof of the death of any person insured under the group policy *while such insurance was in full force and effect* to the person or persons entitled thereto the maximum sum of $10,000. The available coverage was increased to $20,000 by amendment to the master policy dated October 22, 1959.

The premium was to be paid by the Minnesota State Bar Association semiannually in advance.[4] The amount of the premium to be paid was calculated with reference to the insurance outstanding on the effective date of the policy and semiannually thereafter. The amount so paid as advance premium could be more or less than that finally owing because

---

statement by any person insured under this policy will be used in any contest unless it is contained in the written application of such person and unless a copy of such application is or has been furnished to such person or to his beneficiary."

Section C3 of the policy provides: "The Company will issue to the Policyholder for delivery to each person insured hereunder an individual certificate setting forth the benefits and privileges to which he is entitled, the beneficiary of such benefits, and the conversion privileges. Such certificate, however, will state that it does not modify or extend the liability of the Company as set forth in this Group Policy."

[4] The master policy provides: "This policy is issued in consideration of the payment by the Policyholder of the semiannual premium due on its effective date and the payment thereafter of all premiums as they become due as provided in [the policy]." Section L1 provides: "The *Policyholder* will pay to the Company all premiums due under this policy." (Italics supplied.) Section D1 provides: "All premiums will be payable in advance, * * *."

of a variance between (a) the premium payable on account of insurance afforded to members becoming insured during the period and (b) that not payable because of members who ceased to be insured. To meet this likelihood the policy provides:

"If the amount of premiums paid to the Company for any period is less than the total of premiums required * * * the additional amount due will be payable upon demand; if more, the amount of excess paid will be returned by the Company."

In addition, uncertainty as to the amount in dollars payable in advance for the premium resulted from this provision with respect to dividends:

"This policy while in force will participate in the profits of the Company accruing to it as determined and apportioned by the Company. The Company will determine and apportion such profits annually as of the policy anniversary, provided all premiums to the policy anniversary have been fully paid. The profits apportioned to this policy will be paid to the Policyholder in cash as a dividend. The Policyholder may authorize the Company to retain the dividend thus payable to be applied upon any premium when due."

The initial term of the policy was from December 22, 1955, to December 22, 1956, it being contemplated that the policy could be, as it was, renewed annually thereafter.

We examine the policy to ascertain the conditions under which Union Central was to be discharged from its responsibility to make payment of benefits to designated beneficiaries upon the death of an insured member. Its basic obligation was to pay the agreed death benefit upon receipt of due proof of the death of any person insured under the group policy.

In this connection, Section C1 provides:

"* * * The Policyholder will also furnish to the Company from time to time the names of all persons whose insurance is to be * * * terminated, together with whatever information is necessary to establish the * * * date, and reason for such * * * termination."

Section H1 provides that upon termination of membership the insured member's insurance would cease subject to his right to make application

within 31 days for replacement coverage. But there is nothing in the policy which says that insurance coverage afforded to an insured member is contingent upon *payment* of premiums *by him*.

To have been eligible for insurance Larson must have been a member in good standing of the Minnesota State Bar Association who made application for the insurance and entered into arrangements with the policyholder (M.B.A.) required for its maintenance. Since he was insured from December 22, 1955, until June 22, 1960, at least, we assume that everything required of him up to that point was done.

The master policy was cancelable if the Minnesota State Bar Association failed to pay the semiannual premium in advance as required by the formula set out in the policy. But that problem is not involved here. There has been no attempt to terminate the entire plan for refusal to pay the computed premium.

The closest thing we have to a specification of the conditions under which insurance payable on account of the death of a designated insured member would lapse is to be found in Section H1 where it is stated that the insurance to which an insured member is entitled will cease 31 days after termination of his membership in the Minnesota State Bar Association. There is nothing in the certificate which gives clarification to this aspect of the matter. There is reference made in the certificate of insurance under the caption "DISCONTINUANCE OF INSURANCE" to the fact that the group policy provides (Section L) that an insured member who wishes to discontinue his insurance may do so on written notice to the policyholder (i. e., M.B.A.). In such event the insurance to which such insured member is entitled ceases as of the date to which premiums are fully paid. But there is no comparable language in the policy or certificate giving the insurer a similar power to discontinue the coverage of an insured member.

In summary, there is no language in the master policy or in the certificate of insurance issued to Lawrence O. Larson which imposed on him the obligation to pay premiums in any amount at any given time as a condition precedent to the continuance of the duty of the insurer to pay death benefits in the event of his death during such time as the master policy was in force and effect. Having applied for the protection, Larson

was undoubtedly under a legal obligation to pay for the insurance of which his designee was to be the beneficiary. But this does not mean that the penalty for nonpayment at any given time was unilateral termination of the coverage afforded.

Haas v. Mutual Life Ins. Co. 84 Neb. 682, 121 N. W. 996, 26 L. R. A. (N. S.) 747, a leading case as to the consequence of nonpayment of premiums on the coverage of a life insurance policy, refers to the following quotation from May, Insurance, § 343, to explain the distinction with which we are concerned (84 Neb. 689, 121 N. W. 999):

"* * * If, however, the policy contains no such proviso (that is a proviso for forfeiture), though the charter and by-laws require the payment of annual premiums, the nonpayment of the annual premium when due does not work a forfeiture. Such a policy insures for the number of years stipulated absolutely, leaving the annual payment of the premium to be enforced, not as a condition, but as a part of the consideration agreed to be paid."

Other authorities holding that nonpayment of premium does not work an automatic forfeiture of insurance coverage, at least during the agreed term of the policy, include: Federal Life Ins. Co. v. Jones (D. C. Mun. App.) 131 A. (2d) 879; Union Trust Co. v. Chicago Nat. Life Ins. Co. 267 Ill. App. 470; De Michele v. London & Lancashire Fire Ins. Co. 40 Utah 312, 120 P. 846; Friend v. Southern States Life Ins. Co. 58 Okla. 448, 160 P. 457, L. R. A. 1917B, 208; Fourth & First Bank & Trust Co. v. Fidelity & Deposit Co. 153 Tenn. 176, 281 S. W. 785, 45 A. L. R. 610; Fidelity & Deposit Co. v. Hawkins Marble & Tile Co. 148 Kan. 744, 84 P. (2d) 875; Solvency Mutual Guarantee Co. v. York, 3 H. & N. 587, 157 Eng. Rep. 603; Equitable Life Assur. Soc. v. Golson, 159 Ala. 508, 48 So. 1034; State Life Ins. Co. v. Murray (3 Cir.) 159 F. 408; Keeton v. National Union (Mo. App.) 182 S. W. 798; National Life & Acc. Ins. Co. v. Lockett, 65 Ga. App. 866, 16 S. E. (2d) 776; Lankford v. State Life Ins. Co. 57 Ga. App. 626, 195 S. E. 907. See, also, 45 C. J. S., Insurance, § 473(5); 29 Am. Jur., Insurance, § 587.

None of these cases deals with the problems peculiar to a policy of group life insurance. But the basic considerations are the same.

This court has declared that it will indulge in no presumptions fa-

vorable to a forfeiture of insurance. Ibs v. Hartford Life Ins. Co. 119 Minn. 113, 137 N. W. 289. And our decisions holding that nonpayment of premiums can result in an automatic forfeiture of insurance policy rights are based upon language to that effect in the insurance policy involved. Banholzer v. New York Life Ins. Co. 74 Minn. 387, 77 N. W. 295, 78 N. W. 244, 84 N. W. 1115, and Brown v. State Auto. Ins. Assn. 216 Minn. 329, 12 N. W. (2d) 712, are illustrative of cases in this category.

Coughlin v. Reliance Life Ins. Co. 161 Minn. 446, 201 N. W. 920, is illustrative of the position this court has taken where there is no provision in the policy permitting forfeiture for nonpayment. There it was held that a provision in a promissory note given in payment of a premium to the effect that nonpayment of the note would effect forfeiture of the life insurance policy was nugatory because of an absence of policy language declaring nonpayment of notes given for premiums a ground for forfeiture.

The insurer cites Williams v. Sun Life Assur. Co. 235 Mo. App. 741, 148 S. W. (2d) 112; Greer v. Equitable Life Assur. Soc. 180 S. C. 162, 185 S. E. 68; and Annotation, 68 A. L. R. (2d) 225 to 235. Not one of these authorities deals with a case having the following significant characteristics of the problem before us:

(1) The master policy effective December 22, 1955, is for a one-year renewable term and was, at the time of Larson's death, in effect for the period from December 22, 1959, to December 22, 1960.

(2) The premium due the insurer for members covered by the policy was payable by the policyholder (M.B.A.). The amount of the premium was to be determined by a formula contained in the policy which depended essentially on the number of M.B.A. members insured and the age of such members at the birthday nearest the anniversary date of the policy.

(3) The membership contributions of the member were paid, not to the insurer, but to Group Administration, an agency established for the purpose of collecting such membership contributions on behalf of the policyholder.

(4) There is no provision in the policy from which it can be inferred

that the mere failure of a member to make a contribution when due would diminish the obligation of the policyholder (M.B.A.) to make the premium payment attributable to that member's inclusion in the list of insured members used to determine the policyholder's premium obligation.

(5) The express provisions of the policy do not include any clear direction as to the circumstances under which membership coverage can be terminated in the absence of a termination of the individual's membership in the Minnesota State Bar Association.

(6) The purported forfeiture of the membership coverage occurs in the middle of a term for which the insurer has committed itself to pay death benefits and the insured member was in good standing at the inception of the term, having paid his membership contribution for the first 6 months of the period.

In our judgment the situation is one which evokes the general principle against forfeiture of coverage in the absence of a policy provision permitting it. We need not decide what the result would be had Larson failed to pay the membership contribution due at the beginning of the term. Whether the payment of a membership contribution at the inception of a term is a condition precedent to the obligation to insure for a term of one year is a question to be decided when a case arises involving the problem.

■ We now consider the effect of the claimed misrepresentations on the coverage.

It is not contended—and could not be—that the original insurance in the face amount of $10,000 was affected by the misrepresentations of fact attributable to Larson or persons acting for him which resulted in an increase of his coverage from $10,000 to $20,000 in 1959.

The findings of the jury to the effect that intentional misrepresentations of material fact were made which induced the insurer to issue the additional $10,000 of coverage are supported by the evidence. The insurer is relieved of this additional obligation to pay unless its assertion of the defense of fraud is precluded by certain provisions of our statutes regulating the relationship between insurer and persons insured.

Minn. St. 61.30 provides:

"No policy of life insurance shall be issued in this state \* \* \* unless the same contains the following provisions:

\* \* \* \* \*

"(4) A provision that, in the absence of fraud, all statements made by the insured shall be deemed representations and not warranties, and that no such statement shall avoid the policy unless it is contained in a written application, and a copy of the application is endorsed upon or attached to the policy when issued."

Plaintiff acknowledges that her claim cannot be based upon this section of the statutes. This is so because § 61.38 provides specifically that § 61.30 shall not apply to group policies such as the one here involved. Plaintiff's argument is that § 61.24 should be construed the same as § 61.30, subd. 4, would be were it applicable to group policies. Minn. St. 61.24 concludes with this sentence:

"\* \* \* Every policy which contains a reference to the application, either as a part of the policy or as having any bearing thereon, shall have a copy of such application attached thereto or set out therein."

In our judgment, § 61.24 does not preclude Union Central's defense based upon the misrepresentations appearing in the application for increased coverage in 1959 for these reasons: (a) Although the last sentence of § 61.24 contains a directive that a copy of the application for a policy issued in this state without previous medical examination be attached to the policy, there is a significant absence of the language to be found in § 61.30, subd. 4, to the effect that no statements in the application shall serve to avoid the policy unless a copy of the application is endorsed upon or attached to the policy when issued. (b) The misrepresentations here involved appear in a written application for increased coverage as distinguished from an application for initial coverage under a policy issued without previous medical examination. (c) The "policy" issued in this case was the master policy delivered by Union Central to the Minnesota State Bar Association. The mechanics of attaching the application for insurance or for increased coverage of each member to this policy would be cumbersome. The likelihood that any useful purpose would be served is remote. We do not think that

the legislature would limit a claim of fraud without substantial reason. We cannot find an intent to do so in the language of § 61.24.

Plaintiff calls our attention to paragraph (3) of the insurance certificate issued to Larson, which provides:

"The Group Policy, together with the Policyholder's application, a copy of which is attached thereto, together with the applications, if any, of those persons who are insured under the policy, constitutes and contains the entire contract."

Section G1 of the master policy states:

"CONTRACT. This policy, together with the Policyholder's application, a copy of which is attached hereto, and together with the written applications, if any, of those persons who are insured under the policy constitutes and contains the entire contract. All statements will be deemed to be representations and not warranties. No statement by the Policyholder will avoid this policy unless it is contained in the written application and unless a copy of such application is attached to this policy when issued. No statement by any person insured under this policy will be used in any contest unless it is contained in the written application of such person and unless a copy of such application is or has been furnished to such person or to his beneficiary."

It is true that neither the application for additional insurance nor the application for reinstatement was attached to the master policy or to the certificate. It is true also that the misrepresentations, upon which the insurer was entitled to rely in order to defeat the additional coverage which results because of the 1959 application, are statements by a person insured under the policy. However, the provisions of the certificate and the policy do not preclude the defense asserted because (a) Section G1 requires only that statements by the *policyholder* (M.B.A.) be attached to the policy when issued, and (b) the only requirement with respect to vitiating statements by "any person insured" as a condition precedent to use in any contest is that a copy of such application be *"furnished to such person or to his beneficiary."* (Italics supplied.)

We do not find any waiver by defendant of its defense based on the misrepresentation.

■ It is unnecessary to resolve the remaining contentions of plaintiff. Whether the misrepresentations involved are to be tested by the standard appearing in § 60.85 or that embodied in § 61.24 makes no difference. The jury found that the misrepresentations were made with intent to deceive and defraud and that the matters misrepresented increased the risk of loss. On either ground the misrepresentations met the standard specified by § 60.85. Nielsen v. Mutual Service Cas. Ins. Co. 243 Minn. 246, 67 N. W. (2d) 457. In addition, the trial court concluded [5] that the misrepresentations were "wilfully false and intentionally misleading," which meets the standard specified in § 61.24.

Our disposition of the case makes the determination of whether Larson signed the 1960 renewal application immaterial.

The case is remanded to the district court for a new trial on the issue of whether Larson's membership in the Minnesota State Bar Association had been terminated for 31 days prior to his death. If the insurer fails to sustain the burden of proof of showing that an effective termination of membership, in accordance with the rules and regulations covering the relationship between the Minnesota State Bar Association and its members, had been effected, plaintiff will be entitled to recover $10,000 with interest and costs but no more.

In remanding this matter to the district court for retrial, we feel it proper to note that the position taken by plaintiff at the time of her post-trial motion and upon this appeal, to the effect that the failure to pay the midyear membership contributions did not serve to forfeit the benefits otherwise payable upon Larson's death, was obscured by the complaint and amended complaint. We find no place in the record where this aspect of the matter was called clearly to the attention of the trial judge before the motion for a new trial. Had the district court based its refusal to grant a new trial upon the ground that there was a prejudicial shift of theory by plaintiff after the trial was concluded, plaintiff's lawsuit might well be over. But the trial judge did not take this position. We infer, therefore, either that the point was somehow made at trial or that the trial judge, considering the problem to be both new and fundamental, was concerned that the rights of decedent's

---

[5] See footnote 2.

beneficiary be preserved to the extent permitted by law. In deference to this approach, we have made the analysis of the legal issue thus raised and decide that the record does not meet the strict standards applicable to a finding of lapse or forfeiture.

We feel that there should be a new trial of the issue only because defendant's counsel may have been misled by the pleadings and trial developments and, as a consequence, may have failed to present available evidence that Larson's membership had in fact been terminated at a time and under circumstances which would defeat plaintiff's claim on the policy.

Affirmed in part; reversed in part and new trial granted with respect to limited issue.