211 So.2d 477

**COMMERCIAL UNION INSURANCE COMPANY OF NEW YORK**

**v.**

**SECURITY GENERAL INSURANCE COMPANY et al.**

**6 Div. 444.**

Supreme Court of Alabama.

June 6, 1968.

Robt. E. Parsons, Jack J. Hall, Baker, McDaniel & Hall, Birmingham, for appellant.

Brown, Pointer, Williams & Heaps, Birmingham, for appellee.

HARWOOD, Justice.

The Commercial Union Insurance Company brought a bill for declaratory judgment against the Security General Insurance Company and others seeking to have a policy of automobile liability insurance issued by Security General to John Sissons covering Sissons' 1964 Oldsmobile automobile, declared to be the primary policy responsible for claims growing out of an automobile accident in Pratt County, Kansas, on 6 September 1964.

Commercial Union, the appellant, also afforded liability coverage to Sissons' father by virtue of its having issued a fleet policy to the father's employer.

It is undisputed that if General Security's policy was in force at the time of the accident then Commercial Union's liability would be secondary, and Security General's would be primary.

It appears that on 6 September 1964, the Oldsmobile was being driven by Sissons' father, with Sissons' permission, on a public highway in Pratt County, Kansas. The Oldsmobile veered to the left and collided head-on with an automobile with a camper trailer attached which was owned and operated by Lawrence M. Nolen. Mr. Nolen's wife and mother were passengers in his automobile, and suffered injuries. Mr. Nolen's automobile and camper trailer were also damaged. Claims for damages for personal injuries were made by Nolen's wife and mother, and Mr. Nolen also claimed damages for injuries to his automobile and camper trailer. The Travelers Insurance Company, which carried collision

insurance on Mr. Nolen's vehicle, paid the damages to Nolen's vehicle, and as Nolen's subrogee made claim for the damages so paid.

Arnold T. Larsen, Claims Manager for Commercial Union's regional claims office in Kansas City, Missouri, as a witness for Commercial Union, testified that he supervised the investigation and settlement of the Nolen claims and the Traveler's claim.

He first telephoned and then wrote Security General on 12 January 1965, requesting Security General to assume investigation and settlement of the claims to the limits of their policy.

On 14 January 1965, Security General wrote Larsen that Sissons had no policy in force on the date of the accident; that prior to the accident Security General had canceled Sissons' policy. The letter further stated:

"We were not aware of the fact that Mr. Sissons had moved or departed from the State of Alabama and the City of Birmingham. Our first knowledge of his whereabouts being other than Birmingham was subsequent to this accident having occurred."

To this letter Larsen replied on 3 February 1965, calling attention to the fact that Security General had written a notice of cancellation to Sissons stating that the reason for cancellation was that he had moved from the Birmingham area. (This notice of cancellation was mailed to Sissons on 17 August 1964). Larsen called attention to the inconsistency resulting from Security General's assertion that it had no knowledge that Sissons had moved from the Birmingham area until after the accident, and their prior efforts to cancel the policy in August 1964 on this very ground.

After Security General's denial of coverage, Commercial Union proceeded to investigate, negotiate, and settle the Nolen and Traveler's claims, the responsibility of James Sissons in causing the accident being clear.

Mary Nolen's claim was settled for $1500.00, Marjory Nolen's for $15,000.00, and Traveler's original claim for $8000.00 was settled for $5,500.00.

Mr. Larsen testified that from his investigation of the claims, the amounts paid in settlement were reasonable, as was the adjuster's bill for $392.30. Canceled checks in payment of these claims were received in evidence.

After hearing the evidence, the trial court found that the policy issued by Security General had been issued in reliance upon certain oral and written misrepresentations made by Sissons in his application for the policy; that the matter represented by Sissons increased the risk of loss under said policy; that said representations were false and were relied upon by Security General to its prejudice, and the knowledge of truth of the matter misrepresented would have reasonably influenced Security General in accepting the risk insured against by it.

The court further found that Sissons removed his insured automobile permanently from the principle place it was to be garaged as set out in the policy without notifying Security General of such removal. The court also found that the policy of insurance issued to John Sissons by Security General was not in effect and afforded no coverage to Sissons at the time of the accident in Pratt County, Kansas.

Accordingly the court ordered, adjudged, and decreed that Commercial Union Insurance Company be denied the relief prayed for in its complaint as amended, i. e., that Security General be declared and adjudged primarily liable for the damage arising from the Kansas accident.

The evidence presented below tends to show that for two or three years John Sissons had been well acquainted with Joe A. Cooper, Jr., who during the good part of their acquaintanceship was an agent for the State Farm Insurance Company. Cooper had written two or more policies on Sis-

sons' automobiles during this acquaintance-ship.

Cooper had also written a tenant home owner's policy for Sissons during the time he was connected with State Farm and also a $50,000.00 life insurance policy. In connection with the life insurance policy, Cooper testified that a background and credit check was obtained on Sissons. Cooper considered Sissons a desirable insurance risk.

Later Cooper became an agent for Security General. He had previously written a liability policy for Sissons on a 1964 Oldsmobile automobile. When the policy on the Oldsmobile was about to expire, Cooper solicited Sissons to insure his Oldsmobile with Security General, even though the premiums for the Security General policy would be somewhat higher.

In this connection Cooper on 21 April 1964, had Sissons execute an application for automobile insurance with Security General. One of the blank spaces in the application form provides for "Driver's license number" and in this space appear the numbers 2512383. Also on this application Sissons indicated he had received no driver's citations within the past five years.

For Security General, Joe A. Cooper, Jr., testified that he went with Security General about March 1964, and immediately began taking Sissons' various policies of insurance out of State Farm and putting them with Security General. He knew the State Farm policy on Sissons' 1964 Oldsmobile was expiring and he solicited Sissons to insure this automobile with Security General. He took an application to Sissons' office which he had largely filled out from data in his possession relative to Sissons' prior policies with State Farm. In connection with the driver's license number, Cooper testified that he asked Sissons for his Alabama driver's license number and Sissons got a driver's license from his billfold and gave him a number which he wrote in the application. Cooper did not see the driver's license.

Upon the execution of the application, Sissons paid a premium due under the policy of some $127.20. Within due time Security General issued the Family Combination Automobile policy to Sissons pursuant to the application.

The home office of Security General in Winston-Salem, North Carolina, requested through a reporting agency that a motor vehicle report be obtained on Sissons. On 20 May 1964, they were informed that there was no record of an Alabama driver's license being issued to John Sissons. They then wrote to Cooper inquiring about this and were advised by Cooper that the driver's license number appearing on the application was correct.

Cooper testified that he gave this information after a telephone conversation with Sissons. He further testified that in this telephone conversation or at the time the application was made, Sissons informed him that Mrs. Sissons did not have an Alabama driver's license but did have one from Arkansas, and Cooper requested that she proceed to obtain one. Security General's home office then wrote Cooper requesting Sissons' middle name, and being furnished this information they requested a second motor vehicle report on June 16, 1964, and on June 19, 1964, were again informed that there was no record of an Alabama driver's license being issued to Sissons. On June 26, 1964, the underwriting department of Security General again advised Cooper that there was no record that Sissons had an Alabama driver's license and asked him to again check with Sissons.

Cooper was unable to locate Sissons and learned he had left Birmingham. Informing the home office of this development, he recommended cancellation of the policy.

On June 28, 1964 the policy records were transferred to a new agent Robert Stevens.

On August 14, 1964 the underwriting department of Security General requested cancellation of the policy indicating such

action was on request of the District Sales Manager (Mr. Cooper). Thereafter on August 17, 1964, Joe M. Helms of the underwriting department of Security General mailed a letter to Mr. Sissons at his Birmingham address informing him:

"Because you have left our area of operation, we can no longer give you the personal attention you deserve. Our experience shows you will get better service if we terminate our policy and let you obtain insurance from the company serving your new area.

"Your policy is, then, cancelled effective 12:01 A.M., on the date above shown (August 26, 1964).

"Please understand that this termination will not have an unfavorable effect on your insurance record, and if you should return to our area we hope you will again give us the opportunity to serve you." (Par. ours.)

This letter was returned by the Birmingham Post Office with the notation, "Moved—left no address."

Sissons testified he never received this notice of cancellation.

Sissons' testimony was that Cooper at no time asked him for an Alabama driver's license number, and at the time Cooper asked him for a driver's license number he gave him the number from an Arizona driver's license which he thought was in effect. This license had expired in 1963.

The record shows that Sissons' Arizona driver's license had expired prior to the execution of the application for the policy in question, and his Louisiana driver's license had expired on 2 January 1964, some four months prior to the execution of the application. Although Sissons had resided in Alabama for a year and a half, he had not obtained an Alabama driver's license.

Cooper testified that Sissons could have kept his automobile liability coverage with State Farm merely by sending to State Farm the premium when it became due.

Counsel for appellant has grouped for argument assignments of error 1, 5, 6, 7, 9, 10, 11, 13, 14, and 15.

Assignment of error 1 is to the effect that the court erred in rendering its decree in favor of Security General.

Assignment 5 is to the effect that the court erred in finding that Sissons made oral or written misrepresentations in the application with intent to deceive.

Assignment 6 is to the effect that the court erred in finding that Sissons made misrepresentations in the application for insurance and that the matter misrepresented increased the risk of loss under the policy.

Assignment 7 asserts that the court erred in finding in its final decree that the representations were false and were relied upon by Security General to its prejudice and that knowledge of the matter would reasonably have influenced Security General in accepting the risk.

Assignment 9 is to the effect that the court erred in finding that the policy was not in effect at the date of the accident.

Assignment 10 asserts error in the court's failure to find that the Security General policy afforded coverage to Sissons; that Security General had a duty to investigate, settle, or defend claims arising from the accident, and to pay as reimbursement the amounts paid by Commercial Union in settlement of the claims.

Assignments 11 and 12 are to the same effect as assignment 10.

Assignment 13 asserts that the court erred in failing to hold that the policy issued by Commercial Union was secondary to the policy issued to Sissons by Security General.

Assignment 14 asserts that the court erred in its final decree in that its find-

ings of fact and the decree based thereon were contrary to law.

Assignment 15 is the same as assignment 14, except that it asserts that the findings of fact and the decree based thereon were contrary to the weight of the evidence.

Counsel for appellee contends:

"One of the assignments so argued in bulk (Assignment No. 15) asserts that the various findings of fact of the decree were contrary to the weight of the evidence. Yet, one of these findings was that Sissons misrepresented a fact (i. e. driver's license) in applying for the policy—and this finding is *conceded* by Appellants to be correct and without error. (See Appellant's brief, p. 4). For this reason alone all the alleged errors argued in conjunction must be categorically rejected by this Court."

This argument overlooks the fact that even though Sissons did not have a live driver's license at the time of the execution of the application, if this fact was not represented with intent to deceive, or did not increase the risk of loss, the ultimate findings of the court could be contrary to the weight of the evidence.

While one or more of the assignments may be faulty as being too general, yet they are all interrelated and are governed by the same legal principles. We consider assignments 6, 7, and 9, sufficient. Also implicit in assignment 10, i. e., the court's failure to decree that the Security General policy was primary, and to order reimbursement of the amounts paid by Commercial Union in settlement of the Nolen's and Traveler's claims, is the conclusion of the court that Security General's policy was not in force at the date of the accident.

Thus these assignments all definitely raise the point of whether under Section 6, Title 28, Code of Alabama 1940, the misrepresentations of Sissons in the application were made with intent to deceive, or increased the risk of loss. The remaining assignments, as before stated, are all related to this point.

When assignments are so related as to present a single question, it is proper to group them for argument, and the rule that if unrelated assignments are argued in bulk, and one assignment is not well taken, then reviewing the remaining assignments will be pretermitted, will not be invoked. Wells Co. v. Lane, 217 Ala. 10, 115 So. 77; White Dairy Co. v. Sims, 230 Ala. 561, 161 So. 812; Boohaker v. Trott, 274 Ala. 12, 145 So.2d 179.

Since the application was not made a part of the policy, our consideration of the questions as to the effect of the driver's license number shown in the application is governed by Section 6, Title 28, Code of Alabama 1940, which provides:

"*Misrepresentation in application or proof of loss; when material.*—No written or oral misrepresentation, or warranty therein made, in the negotiation of a contract or policy of insurance, or in the application therefor or proof of loss thereunder, shall defeat or void the policy, or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss."

The above code section, as well as our cases, makes it clear that the misrepresentation or warranty must be predicated upon one of two alternatives, either that material matter was misrepresented with actual intent to deceive, or that the matter be such as to increase the risk of loss. It is not essential that both alternatives concur. *All States Life Ins. Co. v. Johnson*, 239 Ala. 392, 194 So. 877.

As to the first alternative, actual intent to deceive, it is stated in *Sovereign Camp W.O.W. v. Deese*, 236 Ala. 85, 181 So. 274:

"The intent to deceive, within the meaning of the law, is the intent to induce his acceptance as an insurance risk

by false statements. No such intent can be inferred from statements wholly immaterial in the premises."

We do not think it can be rationally inferred from the evidence that any representation or misrepresentation that Sissons may have made in reference to his driver's license was made with the intent to induce his acceptance as an insurance risk. Sissons already had an automobile liability policy with the State Farm which could have been kept in force merely by payment of the premium when it came due. He was solicited by Mr. Cooper, the agent of Security General, to substitute the State Farm policy for one in the Security General, even though the rates in Security General were slightly higher. Neither Sissons' Arizona license nor his Louisiana license had been suspended or revoked, though both such licenses had lapsed by his failure to renew them.

The only authority which could revoke or suspend his driver's license would be the authority which granted the same. Dariano v. Blocksom, 389 Pa. 96, 132 A.2d 186.

A lapsed license for failure to renew is distinguished from a revoked, suspended, or a refused license in that in the first instance the license becomes inoperative by lapse of time, the competency of the licensee as a driver not being involved, whereas a revoked or suspended license usually results from violation of traffic laws which does reflect upon the competency of the licensee.

Since the insurer drew the application, it is clear that such application must be construed more strongly against the insurer. Dariano v. Blocksom, supra.

The application now being considered merely calls for "Driver's license number." It does not call for a driver's license in a particular state. Had this additional information been of importance to the insurer, it should have so indicated in the application form.

We hold that under the facts of this case any misstatement as to the driver's license in the present application was not such as to be considered made with the intent to induce Sissons' acceptance as an insurance risk.

We now consider the second alternative (Section 6, Title 28, Code of Alabama 1940), as to whether the misrepresented existence of a driver's license was such as to increase the risk of loss.

The present policy was a family combination automobile policy. Sissons informed Cooper that his wife did not have an Alabama driver's license at the time the application was made, but had an Arkansas driver's license. This fact was reported to Security General. Cooper merely told Sissons to have his wife procure an Alabama driver's license. Further, under the coverage provisions of the policy it was provided that coverage extended to "any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission."

It is to be noted that the policy contains no requirement that the members of insured's household or any person using the insured automobile with the permission of the insured should be licensed drivers. Further, Security General had been informed by two motor vehicle reports that Sissons had no Alabama license, all within thirty days of the issuance of the policy. In view of this, Security General did not cancel the policy within the 60 day period provided for in the policy within which it could have been canceled at the option of the insurer. Apparently therefore, Security General itself did not consider that the misstatement as to Sissons' driver's license number was material to the coverage of the policy.

As stated in 29 A.L.R.2d, page 970:

"The weight of authority is to the effect that, since the operator's negligence

is to be determined by the facts existing at the time of the accident, mere lack of an operator's license is not in itself evidence of negligence in the operation of the motor vehicle in the absence of some causal connection between the injury and the failure to have the license, many of these cases having discounted any causal relation, and holding, therefore, that the lack of a license was immaterial to the issue of negligence, original or contributory, in the operation of the vehicle at the time of the accident."

In the proceedings below Mr. Frank H. Rainer, a vice president of the Alabama Farm Bureau Insurance Company who qualified as an expert in the field of underwriting, testified that in his opinion, based on risk of loss, the fact that an individual did not have a valid driver's license at the time he made an application for automobile liability insurance and had let two prior driver's licenses expire, would not tend to increase a risk of loss in itself, and the fact that an individual did not have a driver's license would not increase the risk of loss and the chance that such an individual would have a loss would be no greater than if he had obtained a valid Alabama driver's license.

Dr. John Hall who qualified as an expert in the field of underwriting and risks, testified that the factors of whether there is in existence at a given time a valid driver's license would not in his opinion change the probability that there would or would not be an accident, assuming that a license had expired rather than having been revoked or suspended. Dr. Hall further testified that he was familiar with policies that contained a 60 day cancellation provision and that the purpose of such provision was to give the insurance company an opportunity to investigate the application, during which time they would have a right to cancel for whatever reason they might discover during such period. He further testified that it was a frequent practice for insurance companies to insure people without licenses, especially where their licenses had expired during the contract period, and that the expiration of driver's licenses during the contract period was contemplated by underwriting departments.

Mr. James C. Wilson, Vice President and Actuary Underwriting Manager for Security General, who has had considerable experience in insurance fields, testified that underwriting rules are based on statistics, and in his opinion the risk of loss would be increased if an individual permitted two driver's licenses to expire and failed to obtain an Alabama driver's license after having lived in Alabama for a year and a half. He stated that such would indicate a lack of regard for law and order and irresponsibility on the applicant's part. He further testified on direct examination that from his study of statistics, one who would have done the things above mentioned would be a greater risk.

However, on cross examination Mr. Wilson testified that he did not mean to say that his opinion in the above regard was based solely on his own statistics—that the number of policies studied to support such statistics were not identified closely or conducted precisely with respect to situations where persons had let their driver's license expire, and that *he personally had not specifically made any study for his company in reference to whether drivers who let their licenses expire were a greater risk than drivers whose licenses had not expired.*

■ The burden of proving the materiality of the risk involved in the representation as to whether Sissons had a driver's license was upon the insurer. Allstate Insurance Company v. Orloff (E.D.Michigan), 106 F.Supp. 114; Nielsen v. Mutual Service Casualty Insurance Company, 243 Minn. 246, 67 N.W.2d 457; Martell v. Klingman, 11 Wis.2d 296, 105 N.W.2d 446. See also Life Insurance Company of Virginia v. Mann, 28 Ala.App. 425, 186 So. 583, and cases cited therein.

The only evidence presented by Security General in this regard was the testimony of Mr. Wilson. While testifying on direct examination, he stated his opinion was based on statistics. On cross examination, he admitted he had not made any study in reference as to whether drivers who let their driver's licenses expire were a greater risk than those who did not. Thus Wilson's testimony on this pertinent question is equivocal, and as a whole does not tend to establish that the expiration of a driver's license tends to increase the risk of loss. When challenged, the burden was upon Security General to produce evidence that a court might pass upon.

■ Sissons testified that never during his entire driving history had he ever received a citation for violation of traffic regulations. He so indicated on his application. The existence or nonexistence of a driver's license does not establish the competency or incompetency of a driver.

Further, had Security General so desired it could have provided that it would not be liable for damages caused while the automobile was being driven by an unlicensed driver. Such a provision is not contrary to public policy or void. See Blashfield, Cyc. of Automobile Law and Practice, Per. Ed. Vol. 6, Section 3947.

■ We hold therefore that the lower court erred in applying the law to facts as established below in holding that the misrepresentation increased the risk of loss.

Assignment of error No. 8, argued separately, reads:

"The Court erred in finding in its final decree of February 6th 1967 that Respondent, John F. Sissons removed his automobile permanently from the principal place of garaging as set out in the declarations of the policy without notifying said Security General Life Insurance Company."

Counsel for appellant argues that:

"It is reasonable to presume that the finding by the court as set forth in Assignment 8 affected the court's conclusion that Security General's policy of insurance was not in effect and afforded no coverage on the occasion of the accident."

There can be no doubt but that the evidence is without dispute that Sissons removed his automobile from the place of garaging as set out in the declaration of the policy to another state without notifying Security General. In this aspect the finding of the court was correct. It cannot be said that the court erred in this finding.

As to whether the court was influenced in its conclusions and decree by this finding, we have no way of knowing. A reading of the decree would indicate that the court based its decree on the conclusion that the misrepresentation relative to the driver's license appearing in the application was made with intent to deceive, and that such misrepresentation increased the risk of loss.

We therefore do not assume that the finding as to removal of the automobile from its principal place of garaging influenced the decree of the court. This for the reason that to indulge such assumption would be contrary to the decided weight of authority as to the effect of a garaging provision such as is now being considered.

In the "Declaration" attached as the first page of the Security General policy, it is set forth:

"Item 6. The owned automobile will be principally garaged in the town or city designated in Item 1 above, unless otherwise stated herein."

Item 1 merely states the name of the insured and his place of residence in Birmingham.

In truth and in fact the Oldsmobile was garaged at the location indicated in the

**354**

declaration at the time of the application and issuance of the policy.

The policy provided liability as to "accidents, occurrences, and loss during the time the automobile is within the United States of America, its territories or possessions, or Canada, or is being transported between the ports thereof."

In Universal Underwriters v. Gran et al. (Ohio Com.Pl.), 114 N.E.2d 501, it was stated that a representation as to place of garaging "[is] a statement of expectation only."

In the Security General policy no obligation was placed upon the insured by any of the terms of the policy to notify the company of the removal of the automobile to another place, nor was there any provision that the automobile was covered by the policy only when garaged at the place mentioned in the declaration.

In Republic Indemnity Co. of America v. Martin, 10 Cir., 222 F.2d 438, where a situation highly similar to the present one was being considered, the court wrote:

"In this case there was no representation that the car would be principally used where it was garaged, nor do we think this is a technical distinction. Liability risk stems from the use to which a car is put, not where it is garaged.

\* \* \* \* \* \*

"Had (insurer) intended to limit the principal use of the car to the place where it was garaged, it should so have provided in plain and unequivocal language." (Par. ours.)

In Sutton v. Hawkeye Casualty Co., 6 Cir., 138 F.2d 781, wherein a provision as to place of garaging *and use* of the automobile was considered, the court observed:

"However, since the statement in question was not a warranty of an existing fact, it may be considered whether it was a so-called promissory warranty. Such a warranty is usually regarded as a condition subsequent, violation of which

would defeat recovery under an insurance policy. Conditions subsequent, when relied upon to work a forfeiture must be created by express terms or by clear implication, and are to be strictly construed against the insurer."

The cases cited by appellee related to warranties as to place of garaging and using the automobile, or were fire and theft policies, or the warranty was false at the time the policy was negotiated. We do not consider them applicable to the present situation.

Regardless of the efficacy of assignment 8, this decree is due to be reversed for the errors arising independent of assignment 8. Accordingly, it is ordered that this decree be, and it is hereby reversed, and the cause is remanded to the lower court.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.

