PHYLLIS LaFAVOR v. AMERICAN NATIONAL
INSURANCE COMPANY.

155 N. W. (2d) 286.

December 15, 1967—No. 40,592.

6

*Oppenheimer, Hodgson, Brown, Wolff & Leach* and *Lehan J. Ryan,* for appellant.

*Tracy & Rowland* and *John C. Rowland,* for respondent.

NELSON, JUSTICE.

Appeal from an order of the municipal court of the city of St. Paul denying a motion for a new trial, and from a judgment entered in favor of plaintiff, Phyllis LaFavor, and against defendant, American National Insurance Company, in the amount of $1,488.96, plus interest. The cause was tried without a jury, and the amount of the judgment was

agreed upon by the parties as the amount defendant insurance company must pay if plaintiff was covered during her hospitalization.

During the times herein mentioned plaintiff carried a life insurance policy with defendant. On January 7, 1962, she applied for a policy of medical insurance through a soliciting agent of the company, one Jerry Whorton. In return for a signed application and one month's premium, Whorton gave plaintiff a receipt which provided:

"No liability is created or assumed by the Company, except for refund of this payment, until and unless the policy applied for has been issued."

Whorton took the application and the premium to defendant's branch office in St. Paul where one George D. Wall served as district manager. It appears that the normal procedure was for this office to forward the application for the medical insurance to defendant's home office in University City, Missouri, to obtain approval and the issuance of the policy if approved by defendant. Ordinarily, it would take from 10 days to 3 weeks from the date of application to be acted upon and to be either rejected or approved by the issuing of a policy. The amount of the medical insurance premium paid was in the sum of $18.60.

Whorton testified that the application together with the premium was submitted to one of the girls at defendant's local office for processing in January 1962. He also stated that on February 6, 1962, plaintiff gave him a second premium payment. On February 23, 1962, six weeks after the application was turned over to Whorton, plaintiff entered St. Luke's Hospital for treatment of a heart ailment. She remained in the hospital until April 10, 1962. During her stay at St. Luke's a third premium was given to Whorton although plaintiff had not received the medical policy for which she had applied. There had been no response to plaintiff's application and payments. It is claimed, however, that Whorton told plaintiff and the credit manager of St. Luke's Hospital that, although the policy had not been issued, plaintiff was nevertheless covered.

William P. Kennedy, claims manager for the Health Insurance Division of defendant company in University City, Missouri, testified that defendant had no record of the issuance of the medical policy applied

for; that their files indicated only one policy issued in 1961, which lapsed after the payment of one monthly premium; that there was nothing in the company's records of that division indicating other medical coverage applied for on the part of plaintiff; and that their records did not reflect any application following January 7, 1962. Defendant had no record of receiving any monthly premiums at the home office, but the record indicates that sometime in July 1962, after plaintiff had submitted her claim to defendant, the two monthly premiums paid were returned to plaintiff by defendant's St. Paul office.

Testimony on the part of defendant's representative was that defendant does not give its agents authority to issue a binder or grant interim insurance coverage from the date of application, pending company approval, and that there is no interim insurance and no insurance unless it is ultimately issued by defendant based upon the application and such investigation as defendant may pursue. Under the circumstances there can be no back dating of such policy.

In May 1962, plaintiff filed a claim for medical expenses with defendant, which claim was denied. Thereupon, plaintiff brought this action, alleging that a contract of insurance existed and that defendant was obligated to plaintiff under the contract for certain medical expenses which she had incurred.

Defendant in its answer contended that the June 1961 policy lapsed by failure to pay additional premiums, and that, under the circumstances disclosed by the record, plaintiff's complaint failed to state a claim upon which relief could properly be granted.

The question before us is whether there was a contract of insurance in force at the time plaintiff incurred certain hospital and medical expenses which would have been covered by such contract if in existence. Thus, we are concerned here with whether an insurance applicant can recover from the insurer where no policy has been issued and where no application or accompanying premium was ever submitted to or received at the home office of insurer, a right to reject and to return the premium accompanying the application being reserved by defendant under the terms of the application.

Plaintiff under cross-examination gave the following testimony:

"Q. Mrs. LaFavor, I hand you a document marked as Defendant's Exhibit 1, and ask you to look particularly at the middle portion entitled 'Application for Major Medical Insurance', do you recall if this is the type of application that you filled out for Mr. Whorton?

"A. The exact—it has been quite a while. I couldn't remember exactly, but he did ask me all these questions here.

"Q. And it was for the major medical?

"A. Yes, sir.

"Q. And you signed this form, is that correct?

"A. Yes, sir.

"Q. And above your signature at the bottom down here * * * you will find these words: 'I understand and agree that no insurance shall take effect unless and until this application is approved by the Company and a policy has been issued. I understand that the agent has no authority to waive or alter any of the provisions contained in the policy for which I am applying. I have read all of the foregoing statements; and such statements are true, full and complete, to the best of my knowledge and belief'.

"A. I read that.

"Q. All right, very fine. Also, Mrs. LaFavor, you stated that you paid a premium check at the time, is that correct?

"A. Yes, sir.

"Q. And received a receipt?

"A. Yes, sir.

"Q. And was that receipt similar to this? (Indicating)

"A. The receipt was off the back—or off the policy. It was from this application.

"Q. So, it looked similar to this one, is that correct?

"A. Yes.

"Q. And on this receipt, did you also notice the statement: 'No liability is created or assumed by the Company, except for refund of this payment, until and unless the policy applied for has been issued'.

"A. Yes."

Plaintiff admits that Whorton never told her the policy for which she

had applied had been issued and in fact continually told her the policy had not been issued. Her testimony was as follows:

"Q. On February 6, 1962, did Mr. Whorton again come to your home?

"A. Yes.

\* \* \* \* \*

"Q. Did you give him $18.60?

"A. Yes, sir.

"Q. What did he tell you as to the policy at that time?

"A. That it hadn't been issued yet, but he expected it shortly.

\* \* \* \* \*

"Q. Did you on or about February 23, 1962, enter St. Lukes Hospital at St. Paul, Minnesota?

"A. Yes, I did.

\* \* \* \* \*

"Q. Did anybody representing the American National Insurance Company visit you when you were in the hospital?

"A. Yes, Mr. Whorton did.

\* \* \* \* \*

"Q. What did he tell you about the hospitalization policy?

"A. That it hadn't come through yet, but he had assured me that it would come through.

\* \* \* \* \*

"Q. The next time he visited you was how much later?

"A. Well, it was approximately three weeks later.

\* \* \* \* \*

"Q. Did he tell you that the policy was in force and effect?

"A. That he still hadn't received it."

It thus appears that plaintiff's only testimony regarding insurance coverage was through her conversations with Whorton and through her reading of the provisions of the application and receipt. There is no evidence that defendant ever considered her January 1962 application or that a policy of insurance was issued pursuant to that application.

The direct evidence of defendant's claims manager is to the effect

that the company's records did not indicate receipt by the home office of plaintiff's application of January 7, 1962, and that there was no record of a policy being issued to her after that date.

■ It appears to be established by the great weight of authority that mere delay in passing upon an application for insurance cannot be construed as an acceptance thereof by the insurer which will support an action ex contractu. Thus, the concept of legal relations between an applicant for insurance and the insurance company is essentially and fundamentally the same as that between parties negotiating other contracts and, as such, is purely contractual. Hockemeyer v. Pooler, 268 Minn. 551, 130 N. W. (2d) 367; Schliep v. Commercial Cas. Ins. Co. 191 Minn. 479, 254 N. W. 618; Heiman v. Phoenix Mutual Life Ins. Co. 17 Minn. 127 (153), 10 Am. R. 154. In the Schliep case we held that there is no legal duty on the part of an insurance company to accept or reject an application for insurance; hence, mere delay on the part of the soliciting agent in forwarding the application to that office of the company where the same by its terms would be acted upon does not give rise to an action ex delicto. This would indicate that health insurance in Minnesota is contractual only and there is no such thing as insurance by negligence.[1]

■ According to 29 Am. Jur., Insurance, § 199, and 1 Couch, Insurance (2 ed.) § 7:8, the general rule without any statement in the application is that a contract of insurance is consummated by and not until the unconditional acceptance of the application or proposal for such insurance.

■ The evidence required to support the verdict must not only be consistent with the verdict, but it must also support it. We said in Routh v. Routh, 256 Minn. 203, 97 N. W. (2d) 644:

"In testing the sufficiency of the evidence to sustain a verdict, we must accept the evidence most favorable to the verdict and every inference that may be reasonably drawn therefrom, but such inference must be supported by evidence that will justify it. The burden of producing

---

[1] See, 19 Minn. L. Rev. 247; 34 Minn. L. Rev. 231; Annotation, 32 A. L. R. (2d) 487, 493.

such evidence rests on the party asserting the existence of the fact to be established."

While the evidence in proof of a crucial fact may be circumstantial, it must not leave it in the field of conjecture. The burden of proof being upon the plaintiff, it is not enough that the evidence be consistent with the theory upon which the plaintiff bases her claim. It must go further and must support it. It is never enough that it suggests a possibility. The evidence in proof must justify sound and honest inferences.

In the recent case of Rasmussen v. The Prudential Ins. Co. 277 Minn. 266, 152 N. W. (2d) 359, this court reiterated what it has heretofore said in cases involving life and health insurance policies to the effect that there is no legal duty on the part of an insurance company to accept or reject an application for insurance or submit a counterproposal. See, also, Zemler v. New York Life Ins. Co. 177 Minn. 273, 225 N. W. 81.

True, the circumstances involved in the case at bar were most unfortunate in respect to plaintiff's efforts in seeking health insurance coverage. However, there being no evidence that a policy was issued, the judgment of the lower court must be reversed.

Judgment reversed with directions to enter judgment for defendant.