## NANCY M. USHER, ADMINISTRATRIX OF ESTATE OF VIRGINIA M. GIBSON, v. ALLSTATE INSURANCE COMPANY.

218 N. W. 2d 201.

May 3, 1974—No. 44082.

*Harvey E. Skaar,* for appellant.

*Richards, Montgomery, Cobb & Bassford, Greer E. Lockhart,* and *Jon D. Jensvold,* for respondent.

Heard before Knutson, C. J., and Rogosheske, MacLaughlin, and Yetka, JJ., and reconsidered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

In this action to recover health insurance hospital expense benefits upon alternative theories of breach of an implied contract for interim insurance or tort liability for an unreasonable delay in acting upon decedent's application for insurance, the trial court at the close of plaintiff's case in chief directed a jury verdict for defendant insurance company upon the ground of plaintiff's failure of proof. Plaintiff appeals, contending that there were fact questions presented as to when coverage was effective and as to plaintiff's claim of unreasonable delay in acting upon the application. Because plaintiff's evidence could support a finding of an implied contract of interim insurance and defendant's breach thereof, we reverse and grant a new trial.

Our most recent statement of the rule for directing a verdict can be found in Jacoboski v. Prax, 290 Minn. 218, 220, 187 N. W. 2d 125, 127 (1971), where we stated:

"'* * * Each motion [for a directed verdict] presents a question of law regarding the sufficiency of the evidence to present a fact question for the jury to decide. If there is a fact question presented for jury decision under all of the evidence and the applicable law, the motion should be denied. In Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 325, 79 N. W. (2d) 688, 693, this court expressed the test for granting a motion for a directed verdict as follows:

"'"* * * [I]t is elementary that a motion for a directed verdict—

"'""* * * accepts the view of the *entire* evidence most favorable to the adverse party and admits the credibility (except in

extreme cases) of the evidence in his favor and all reasonable inferences to be drawn therefrom," and such motion "should be granted only in those unequivocal cases where (1) *in the light of the evidence as a whole,* it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the *entire* evidence, or where (2) it would be contrary to the law applicable to the case." ' "

Viewing the evidence and all reasonable inferences most favorably to support plaintiff's claim, it could be found that on February 11, 1971, plaintiff's decedent, Virginia Gibson, applied for health insurance from defendant through one of its agents. In response to questions on defendant's application form, decedent declared that she was in good health and had not been hospitalized or treated by a doctor within 5 years prior to her application except for—

"* * * [w]alking pneumonia Oct. 1970 3 weeks * * * After medication, Xray indicated complete recovery."

The application also contained the following immediately above decedent's signature:

"All of the foregoing statements and answers are complete and true and were read by me and I understand and agree that: a) they shall form the basis for any contract of insurance that may be issued; b) *insurance, if issued, will be effective on the date stated in the policy;* c) sickness which manifests itself within 30 days after the policy's effective date will not be covered." (Italics supplied.)

Before decedent signed the application, she personally read the above language and also had it read to her by the agent. Decedent paid the agent a quarterly premium of $47.60, and the agent forwarded the application to defendant with the request to mail the insurance policy directly to decedent. Upon receipt of the application and the premium check, defendant placed the number 80222747 on the application and cashed the check. In processing the application, defendant's underwriting department

wrote to Dr. Clarence Strunk, decedent's physician, for a report confirming decedent's declaration that she had recovered from the "walking pneumonia."

On March 19, 1971, 36 days after her application, decedent was hospitalized for a condition which was later diagnosed as cancer, from which she died. No reply had yet been received from Dr. Strunk in regard to the "walking pneumonia" when defendant learned that decedent was hospitalized, and thereupon on March 26, 1971, 43 days after the application, defendant refunded to decedent the premium the agent had forwarded with the application and declined to issue the policy. No written policy of insurance was ever issued to decedent.

Although plaintiff argues for liability based upon a claim of unreasonable delay in acting upon decedent's application, we are not urged, nor disposed in this case, to reexamine the rule—in force in this state since 1934—that there is no legal duty on the part of an insurance company to accept or reject an application for insurance. Therefore, mere delay on the part of the company in passing upon the application cannot be construed as an acceptance and will not support either an action for breach of contract or one sounding in tort. Schliep v. Commercial Cas. Ins. Co. 191 Minn. 479, 254 N. W. 618 (1934); LaFavor v. American Nat. Ins. Co. 279 Minn. 5, 155 N. W. 2d 286 (1967). Consequently, we concentrate our attention upon whether the evidence would support recovery under a theory of an implied contract for interim insurance.

In LaFavor, we said (279 Minn. 11, 155 N. W. 2d 290):

"* * * [T]he concept of legal relations between an applicant for insurance and the insurance company is essentially and fundamentally the same as that between parties negotiating other contracts and, as such, is purely contractual."

In the present case, decedent made an offer to defendant company by tendering an application and a check for the first quarter premium to its agent. In examining the application, submitted by decedent but drafted by defendant, we must keep in

mind the well-established rule that ambiguous language on the face of an insurance application will be construed against the insurer. Nielsen v. Mutual Service Cas. Ins. Co. 243 Minn. 246, 67 N. W. 2d 457 (1954).

The application provided that "insurance, if issued, will be effective on the date stated in the policy." Manifestly, this language is ambiguous as to the effective date of coverage since the date stated in the policy could be the actual date the policy is issued, the date of the application, or any other date. Although defendant's agent testified that he had no authority from defendant to bind or issue an oral contract of health insurance, on cross-examination he admitted that in his experience he had seen health insurance policies "when they are issued come out the date that the application is signed." This, we believe—and as plaintiff urges—arguably permitted the court, when considering a motion for a directed verdict at the close of plaintiff's case in chief, to make an inference that defendant company customarily backdated its health insurance policies effective on the date the application was signed.

The application also provided that statements made in it by decedent in regard to her past health record would "form the basis for any contract of insurance that may be issued" and that "sickness which manifests itself within 30 days after the policy's effective date will not be covered." At trial, decedent's physician, Dr. Strunk, testified that decedent was in good health upon the date of her application, had recovered from her October 1970 condition of walking pneumonia, and that the condition for which decedent was hospitalized had not "manifested itself" within 30 days from the date of the application. On the basis of this uncontradicted testimony, a jury could have found that the conditions stated on the insurance application were satisfied and that defendant would have issued a policy had it not learned of decedent's hospitalization.

We hold that if a jury in the instant case had found that defendant customarily backdated its health insurance policies; that

decedent had fully recovered from walking pneumonia upon the day of her application; and that the condition for which decedent was later hospitalized did not manifest itself within 30 days after the date of her application, an interim contract of insurance, effective February 11, 1971, would have arisen by implication of law even though no written policy or contract of insurance was in fact issued to decedent by defendant. Therefore we conclude that there were fact questions presented in this case for jury decision under the facts and applicable law, and consequently the motion for a directed verdict should have been denied.

The trial court's authority to direct a verdict is to be exercised cautiously and sparingly. See, Kolatz v. Kelly, 244 Minn. 163, 69 N. W. 2d 649 (1955). Caution is especially required where the motion is made upon the ground of failure of proof at the close of plaintiff's case in chief rather than at the close of all the evidence. Where, as here, there is such scant proof of customary practice to backdate insurance policies, the trial court understandably overlooked the critical evidence upon which plaintiff had to rely to resist defendant's motion to direct a verdict since, as revealed by the record, the argument focused on questions of law and did not point out the specific lack of evidence to support proof for recovery under plaintiff's alternate theory of an implied contract of interim insurance. This might not have occurred had the motion been one for dismissal under Rule 41.02 (2), Rules of Civil Procedure. Although tested by the same standards as a motion for a directed verdict under Rule 50.01 (see, 2 Hetland & Adamson, Minnesota Practice, Civil Rules Ann., p. 196), it is nevertheless a more apt motion for raising the issue of want of proof at the close of plaintiff's case in chief. This is so because a Rule 41.02(2) motion authorizes a dismissal without prejudice. As utilized in practice, where plaintiff has unwittingly overlooked submission of available evidence to prove a fact essential to recovery, a closer scrutiny of the specifics of missing proof by counsel and the court is more likely to occur and a dis-

missal without prejudice may be ordered unless defendant goes forward with its evidence.

Defendant argues that the instant case is controlled by LaFavor v. American Nat. Ins. Co. *supra,* where we denied the plaintiff recovery under a contract theory and stated that "[i]t appears to be established by the great weight of authority that mere delay in passing upon an application for insurance cannot be construed as an acceptance thereof by the insurer which will support an action ex contractu." 279 Minn. 11, 155 N. W. 2d 290.[1] However, we do not find it necessary to reexamine our prior adherence to the majority rule because we believe that LaFavor is distinguishable from the present case. In LaFavor, the plaintiff tendered her application for health insurance and several premium payments to the defendant company, but the explicit statement on the application and receipt for the premium payments to the effect that insurance coverage would not begin until the policy was issued led us to say that "[u]nder the circumstances there can be no back dating of such policy." 279 Minn. 8, 155 N. W. 2d 288. In the case at bar, the terms of the application would allow the insurance company to date its policy with the date upon which it was issued or backdate it to the date of application. If a jury found that the latter was defendant's customary practice, an implied contract of interim insurance would arise, provided that it was also found that the other conditions stated in the application had been satisfied.

Despite plaintiff's obvious failure to submit additional evidence to support her arguable claim that defendant customarily backdated health insurance policies or to clearly urge this factual dispute in opposition to defendant's motion for a directed verdict, we feel our emphasis on this alleged customary practice is justified. It would be grossly unfair for health insurance companies

---

[1] See Annotation, 32 A. L. R. 2d 487, which states the rule in a vast majority of jurisdictions to be that retention of a premium and delay in accepting an application by an insurance company does not give rise to an interim insurance contract.

to solicit applicants in need of such coverage pursuant to a vague underwriting practice that allowed the company to collect, retain, and use premiums until the first or even subsequent premium periods have elapsed and at the same time retain the option to refuse to issue a policy if illness strikes during the interim or, if no illness occurs, to backdate the policy and apply the previously paid premium or premiums to the elapsed period. This unfairness to health insurance applicants is not dissimilar in principle to the situation where an insurer backdates an automobile insurance policy and then seeks to cancel the policy when it discovers that an accident has occurred between the dates of application and issuance of the policy. In 7 Appleman, Insurance Law and Practice, § 4266, very forceful terms are used to describe the evil that would result from allowing the insurance company to cancel:

"* * * It appears that many companies have fallen into the practice of pre-dating policies to the time when the application for insurance was made. If no loss has occurred in the interval between application and issuance of the policy, all is well. But when such a loss has been sustained, the insurer then attempts to wriggle out of liability on the ground that the risk has been increased without its knowledge. It is submitted that a rule of law which sustains this position is instrumental in perpetrating a fraud upon the insured. If the insurer dates back its policy, and charges a premium for such period of time, it should bear the risk of a loss occurring within the same period of time. It would be monstrous to allow the insurer to charge for a coverage which it was never prepared to assume." [2]

While the criticism addresses a distinguishable underwriting practice for other kinds of insurance than health insurance, its

---

[2] See also Burch v. Commonwealth County Mutual Ins. Co. 450 S. W. 2d 838 (Tex. 1970), where the court adopted the rule that recovery may be had on a policy antedated to include the time at which a loss occurred provided neither party knew of the loss when the contract was made.

rationale applies with equal force to the potential for fraud upon the insured in this type of insurance as well.

Absent a statute or regulation setting a time limit for underwriting investigation of applications for health insurance, we hold that recovery should be allowed on the theory of implied contract in cases where the insurer customarily backdates health insurance policies.

Reversed and remanded for a new trial.

OTIS, JUSTICE (dissenting).

In granting a new trial the majority holds that there was evidence which would support these findings by the jury:

Defendant customarily backdated its health insurance policies.

Decedent had fully recovered from pneumonia on the day of her application.

The condition for which she was hospitalized did not manifest itself within 30 days of her application.

1. On cross-examination, defendant's agent, Donald Jenkins, testified as follows:

"Q. In your experience with health and accident policies, you have seen policies dated when they come out, the date the application was signed, have you not?

"A. Yes."

There is no other evidence that policies were "customarily backdated" other than the isolated statement that the agent had seen policies bear the application date when they were issued. It is inconceivable to me that we would have held this was sufficient testimony to prove by a fair preponderance of the evidence that backdating was a "custom" had the case gone to the jury. Indeed, plaintiff makes no such claim in her pleadings, nor did she at any time argue to the trial court that such a custom was an issue for determination. She insisted there was an oral contract of insurance and merely referred to a case in which the insurer "customarily" backdated workmen's compensation insurance in citing what appears to be Glens Falls Ind. Co. v. D. A. Swanstrom Co. 203 Minn. 68, 279 N. W. 845 (1938).

The majority apparently shares these views when it recognizes "plaintiff's obvious failure to submit additional evidence to support her arguable claim of backdating health insurance policies or to clearly urge this factual dispute in opposition to defendant's motion for a directed verdict."

I respectfully submit it is not our function to give litigants a second chance to try their lawsuits simply because they have failed to sustain their burden of proof at the first trial if they have had a full and fair opportunity to present all of the evidence available to them. There is no claim that the trial court excluded admissible evidence or erred in any other respect in preventing the plaintiff from introducing competent testimony on this key issue.

■ I respectfully suggest that the majority has overlooked the critical testimony of Dr. Strunk concerning Mrs. Gibson's state of health on February 11, 1971. The doctor's statement that she was in good health on that date reflected only his office records as of that time. He did not examine her following her October illness until March 19, 1971, when she entered the hospital. An exploratory operation on March 23 disclosed an advanced mass of cancer in the right middle lobe of Mrs. Gibson's lung from which she died on April 21, 1971.

Dr. Strunk testified that in his opinion Mrs. Gibson was suffering from lung cancer in October 1970, and he so stated in her death certificate. Although in fixing the onset at 6 months he first observed that he was making "a wild guess," he then went on to support that opinion as follows:

"Q. Now, the chest x-ray in October of 1970 showed that she had a problem in the right middle lobe of her lung, is that correct?

"A. That's right.

"Q. And that is a problem which the radiologist concluded was pneumonia, isn't that correct?

"A. That's right.

"Q. Now, the routine x-ray that was taken at North Memorial Hospital on March 19 when she entered, a routine chest x-ray, also showed a problem in the right middle lobe, did it not?

"A. That's right.

"Q. And in the initial x-rays, the radiologist called it consolidation of the right middle lobe, is that correct?

"A. That's right.

"Q. But the radiologist did not make a diagnosis of cancer at that time?

"A. No.

"Q. All he saw was that there was this problem which had earlier been called pneumonia, isn't that right?

"A. That's right.

"Q. Now, as the attending physician you were called upon to fill out the death certificate, isn't that correct?

"A. That's right.

"Q. And during the course of your professional career, Dr. Strunk, I assume that you have made out many of these death certificates?

"A. That's right.

"Q. And one of the questions that you as the attending physician are asked to answer on a death certificate is the approximate interval between the onset and death of the disease that caused the death, isn't that correct?

"A. That's right.

"Q. And on the death certificate you filled in the approximate interval between the onset of the cancer and death as being six months, isn't that correct?

"A. That's right.

"Q. And that was your best estimate of the length of time that she must have had this cancer, isn't that correct?

"A. That's right.

"Q. And that was based on the size of the mass as it was discovered, isn't that correct?

"A. Yes, that's right.

"Q. And also based upon the fact of that earlier x-ray that had been taken in October, which showed a problem?

"A. Yes.

"Q. And that's what you wrote down here on the certificate of death, where it says, 'approximate interval between onset and death, six months. X-ray, October 11, 1970,' isn't that correct?

"A. That's right."

The inescapable inference from Dr. Strunk's testimony is that Mrs. Gibson was not only suffering from pneumonia in October 1970, but that cancer of the lung also was present at that time notwithstanding the fact that the radiologist described her illness as a "consolidation" and did not make a diagnosis of cancer. Not having seen Mrs. Gibson since October, Dr. Strunk was hardly in a position to certify to her good health on February 11 when an examination would have disclosed her terminal illness. Dr. Strunk could not, and did not, respond to defendant's inquiries concerning Mrs. Gibson's health because he had no way of determining that fact without a thorough examination.

■ In my opinion, it is simply not correct to state that this record permits a finding that all of the conditions for issuing a policy had been satisfied at some unspecified date and "defendant would have issued a policy had it not learned of decedent's hospitalization." The evidence, as I see it, is to the contrary. In making its routine underwriting investigation of Mrs. Gibson's application, defendant wrote to Dr. Strunk for a summary of her medical history but did not hear from him "despite several follow-ups." Dr. Strunk admitted that he did not respond to defendant's inquiries. On March 23, 1971, defendant was able to get through to the doctor's office and then learned for the first time that Mrs. Gibson was hospitalized. The reason defendant then refused to issue the policy was because it was "unable to complete her underwriting review" and "her insurability was in doubt."

■ The effect of the majority opinion is to foist coverage on

a health insurer which, in attempting to confirm an applicant's recovery from a prior illness, was unable to determine her insurability and consequently declined coverage. Disclosure of her terminal illness was made after a 43-day interval, prolonged by the failure of the applicant's doctor to respond to the insurer's legitimate inquiries.

This, in my opinion, is not only a manifestly unjust result but is bad law to boot. The majority cites no decision of this court or of any other jurisdiction in support of its conclusion. Our own cases clearly hold otherwise. In any event, I fail to see how the backdating of Mrs. Gibson's policy is relevant since no policy was issued to her, and under our prior decisions the defendant was under no obligation to do so.

Although the majority cites LaFavor v. American National Ins. Co. 279 Minn. 5, 11, 155 N. W. 2d 286, 290 (1967), it does not distinguish that decision. In the instant case, defendant's agent testified as follows:

"Q. Now, do you have authority from the Allstate Insurance Company to bind or to issue an oral contract of insurance for either life or health insurance?

"A. No, sir.

"Q. Have you ever had such authority?

"A. No, sir."

In the LaFavor case, as here,

"Testimony on the part of defendant's representative was that defendant does not give its agents authority to issue a binder or grant interim insurance coverage from the date of application, pending company approval, and that there is no interim insurance and no insurance unless it is ultimately issued by defendant based upon the application and such investigation as defendant may pursue. Under the circumstances there can be no back dating of such policy." 279 Minn. 8, 155 N. W. 2d 288.

A unanimous court in reversing a judgment for the insured noted in LaFavor that health insurance in Minnesota is contrac-

tual only; that "the concept of legal relations between an applicant for insurance and the insurance company is essentially and fundamentally the same as. that between parties negotiating other contracts and, as such, is purely contractual"; that "there is no legal duty on the part of an insurance company to accept or reject an application for insurance"; that it is the general rule that without any statement in the application a contract of insurance is consummated by, and not until, the unconditional acceptance of the application or proposal for such insurance. 279 Minn. 11, 155 N. W. 2d 290. In concluding, we referred to our prior holdings in cases involving life and health insurance policies to the effect that "there is no legal duty on the part of an insurance company to accept or reject an application for insurance or submit a counterproposal." 279 Minn. 12, 155 N. W. 2d 291.

I submit that the proposal of the majority to permit an agent without any express authority to create an implied contract for interim health and accident insurance is unsupported by either the record or by case law here or elsewhere and does violence to our prior decisions. Accordingly, I would affirm.

PETERSON, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Otis.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.