**WASECA MUTUAL INSURANCE COMPANY, Appellant,**

v.

**David NOSKA and Donald Noska, individually and d.b.a. Don's Store, et al., Respondents.**

No. Cl–82–609.

Supreme Court of Minnesota.

April 1, 1983.

Rosenmeier & Anderson and Douglas P. Anderson, Little Falls, Blethen, Gage, Krause, Blethen, Corcoran, Berkland & Peterson, and Bailey W. Blethen, Mankato, for appellant.

Rider, Bennett, Egan & Arundel, Richard H. Krochock and Kevin C. Dooley, Minneapolis, for David Noska and Donald Noska, individually and d.b.a. Don's Store and Illinois Farmers Ins.

Peter Irvine, Perham, for David Noska.

David Stowman, Detroit Lakes, for Donald Noska.

Gregory Peters, Long Prairie, for Lawrence John Smith and Iona Marie Smith.

Richard N. Jeffries and Jeffrey R. Hannig, Moorhead, for Halan F. Killian and Myrna Killian.

Michael J. Ford, St. Cloud, for State Farm Fire and Cas. Co. and George A. Melin, Jr., et al.

Neal Lano, Grand Rapids, for Shelby Mut. Ins. Co.

Hubert H. Humphrey III, Atty. Gen., and Carl M. Conney, Sp. Asst. Atty. Gen., St. Paul, for State.

Richard C. Hefte, Fergus Falls, for Melvin Etzler, et al.

PETERSON, Justice.

### I.

Waseca Mutual Insurance Company (Waseca Mutual), plaintiff in a declaratory judgment action, appeals from an order ruling that it, as homeowner's insurer for defendant David Noska (Noska) rather than Illinois Farmers Insurance Company (Illinois Farmers), the liability insurer of Noska's automobile, must defend and indemnify Noska for liability arising out of extraordinary fires caused by Noska's negligence. Waseca Mutual further appeals from the order determining that, under the unique facts of this case, its policy affords $300,000, rather than $100,000, of coverage.

Noska had for several years been employed by his father in the operation of his father's general retail business in Browerville, Minnesota. One of Noska's duties was to haul the accumulated garbage to a landfill several miles distant from the store. On Monday, April 21, 1980, Noska's shift commenced at 3 p.m., but, at about 2 p.m., he went to the store with his pickup truck, towing a trailer, on which he placed six uncovered 55-gallon steel barrels. The barrels contained burnt material, cans, bottles, and ashes of paper which had been burned some 2½ weeks earlier.

Noska then drove to his home, some 4 miles from the store, to pick up debris from brush and tree limbs that had been burned on April 16. (Although a ban on burning had been in effect, Noska had obtained a permit to burn the brush.) He shoveled the ashes into two of the barrels and then drove at a lawful speed of about 35 m.p.h. toward the landfill, located 6 miles from his house.

As Noska drove to the landfill, sparks flew from the barrels into which he had shoveled ashes at his home.[1] Apparently some of the coals from the brush had remained hot, and (fanned by air as the truck moved) rekindled, escaped from the truck, and started fires on the ground adjacent to the highway on which he was traveling. Noska was unaware of the smoke or sparks coming from the barrel until someone stopped him a short distance from the landfill. While he was dousing the barrels with water, he looked back and saw smoke in the direction from which he had just come. The fires, which apparently started at several points and burned for at least 9 days, covered thousands of acres of land and damaged or destroyed numerous farm properties and homes. Claims by the affected property owners total more than half a million dollars, with other claims remaining to be filed. The State of Minnesota has made a claim in excess of $100,000 for firefighting expenses.

Three insurance policies arguably would have provided coverage for Noska's liability. Noska's homestead was insured under a homeowner's policy issued by Waseca Mutual. The policy contained the standard automobile exclusion denying coverage for claims arising out of use, maintenance, operation, loading, and unloading of an automobile. Noska's truck was insured under an automobile liability policy issued by Illinois Farmers. The store, owned by Noska's father, was covered by a business liability policy also issued by Illinois Farmers.[2] Additional factual details concerning the relevant policy limits and the effective date of the homeowner's policy will be stated in section II of this opinion.

---

1. This statement of facts is derived in part from a stipulation, made for purposes of the declaratory judgment action, that a fire or fires started by sparks flying from one or more of the barrels being towed by Noska's truck. Our account of the facts should therefore not be deemed binding on the parties in any subsequent proceedings.

2. The homeowner's policy also contained a business pursuits exclusion, and there was some controversy in the proceedings below concerning the status of Noska and his father as named insureds in the business liability policy. At oral argument, however, Waseca Mutual abandoned its claim that liability should be imposed on the business liability insurer and excluded from the homeowner's coverage.

The trial court ruled that the act of placing live embers in the barrels was negligent and that the fires arose from this act; as a result, the court concluded that the fires did not "arise out of the use of a motor vehicle." While we affirm the trial court's findings insofar as they determined that one cause of the fires was nonvehicle-related, our review of the record leaves us with a "definite and firm conviction" that the losses also were causally related to Noska's driving his truck at 35 m.p.h. while towing uncovered barrels containing live embers. *Cf. National Farmers Union Property & Casualty Co. v. Nyborg,* 295 Minn. 565, 204 N.W.2d 438 (1973). We are completely persuaded that the extensive fires would not have happened but for use of the vehicle to transport the embers. Thus, the fires also arose from use and operation of the vehicle. This case involves an extraordinary fact pattern: two separate and independent acts concurred to cause the accident, and each act was necessary to cause the damage. It is in this context that we are called upon to determine whether the homeowner's policy, the automobile policy, or both, afford coverage.

■ 1. We have construed the phrase "arising out of maintenance or use of a motor vehicle," in the context of automobile liability policies, in several recent cases,[3] and have established that, for coverage to exist, there must be some causal connection between the injury and the use of the vehicle for transportation purposes. *Tlougan v. Auto-Owners Ins. Co.,* 310 N.W.2d 116, 117 (Minn.1981). In *Tlougan,* we described the requisite connection between use and injury as "something less than proximate cause in the tort sense and something more than the vehicle being the mere situs of the injury," and stated that the connection was established if "the injury is a natural and reasonable incident or consequence of the use of the vehicle." *Id.* To further clarify the

term, in *Holm v. Mutual Service Casualty Ins. Co.,* 261 N.W.2d 598, 603 (Minn.1977), we adopted the requirement of the Mississippi Supreme Court that "the vehicle itself must be an *active* accessory" to the injury sustained. *See National Mutual Casualty Co. v. Clark,* 193 Miss. 27, 40, 7 So.2d 800, 805 (1942).

■ The connection between use of a vehicle and injury was also discussed at length in *Associated Ind. Dealers, Inc. v. Mutual Service Ins. Co.,* 304 Minn. 179, 229 N.W.2d 516 (1975), in which we stated:

> In general terms, it has been established that such relationship need not be a proximate cause in the strict legal sense. Rather, it is sufficient to establish that the injury or loss "was a natural and reasonable incident or consequence of the use of the [insured] vehicle." It has been said that the causal connection must be "reasonably apparent," and that "the mere fact that the use of the vehicle preceded the harm which was later sustained is not sufficient to bring such harm within the coverage of the policy." It has also been held that the policy term "arising out of" means "originating from," or "having its origin in," "growing out of," or "flowing from."

304 Minn. at 181–182, 229 N.W.2d at 518 (footnotes omitted). We also noted that "in any event, each case presenting such a question must, to a great degree, turn on the particular facts presented." *Id.*

Given that use of the motor vehicle was a contributing, indeed necessary, cause of the fire, we hold that the fires did "arise out of use of a motor vehicle" as that phrase appears in the automobile policy. We therefore reverse the order of the district court insofar as it precluded recovery from Illinois Farmers, the automobile liability insurer.

---

**3.** *See, e.g., Waldbillig v. State Farm Mutual Auto. Ins. Co.,* 321 N.W.2d 49 (Minn.1982); *Galle v. Excalibur Ins. Co.,* 317 N.W.2d 368 (Minn.1982); *Krupenny v. West Bend Mutual Ins. Co.,* 310 N.W.2d 133 (Minn.1981); *Haagenson v. National Farmers Union Property & Cas-*

*ualty Co.,* 277 N.W.2d 648 (Minn.1979); *National Family Ins. Co. v. Boyer,* 269 N.W.2d 10 (Minn.1978); *Holm v. Mutual Service Casualty Ins. Co.,* 261 N.W.2d 598 (Minn.1977); *Associated Ind. Dealers, Inc. v. Mutual Service Ins. Co.,* 304 Minn. 179, 229 N.W.2d 516 (1975).

■ 2. The next issue is whether our conclusion that the injuries arose out of use of the truck for purposes of establishing coverage under Noska's automobile liability policy is determinative of whether the truck was "used" so as to exclude coverage under the homeowner's policy. We conclude that recovery against both insurers may properly be permitted where two independent acts, one vehicle-related and one nonvehicle-related, were involved.[4] We are guided to this conclusion by one of our prior opinions and by opinions of courts in California, Wisconsin, Louisiana, and Illinois, which have reached the same conclusion.

In *Woodrich Constr. Co. v. Indemnity Ins. Co.*, 252 Minn. 86, 89 N.W.2d 412 (1958), Woodrich, a general contracting firm, and its general business liability insurer had satisfied a judgment against Woodrich, and were seeking contribution from Woodrich's automobile liability insurer (and two other insurers). Woodrich had been held liable for injuries sustained when a dumptruck, while on a turntable which Woodrich had negligently located, backed over a person in response to negligent signaling by a Woodrich employee. The trial court ruled, and we affirmed, that on the facts in the case, all four insurers were liable. We noted that Woodrich was the sole tortfeasor, 252 Minn. at 89, 89 N.W.2d at 415, and identified two distinct acts on Woodrich's part, one vehicle-related and one nonvehicle-related, which combined to cause the injury. We stated, "Clearly, the negligence of Woodrich in the placement of the equipment and negligence in exercising supervisory control over the truck's movements were inextricably interwoven as concurrent proximate causes of the accident." 252 Minn. at 93, 89 N.W.2d at 417. We raised as an issue whether coverage under a general business liability policy and an automobile liability policy could overlap and decided in the affirmative. After noting the "business risk/automobile risk" dichotomy, which was sometimes relied upon to resolve such cases, we stated:

> The classification shield of itself affords no protection against liability where the risk in the individual case, regardless of its type, reasonably falls within the intent and meaning of the omnibus clause. This is particularly true * * * where it is established as an adjudicated fact that an act of negligence involving general business operations and an act of negligence relating to the operation and use of an automobile are blended together as the proximate cause of a single accident.

252 Minn. at 95, 89 N.W.2d at 419. Thus, where two acts concurred to cause the damage, and one of the acts was covered under the insuring agreement of each policy, we allowed recovery against both policies.

*Woodrich* is virtually identical with the instant case. A homeowner's policy is structurally similar to a general business liability policy—both afford general liability insurance and in both, the phrase "arise out of use of a motor vehicle" operates as an exclusion from coverage. *See Annot.*, "Construction and Effect of Provision Excluding Liability for Automobile-Related Injuries or Damage from Coverage of Homeowner's Personal Liability Policy," 6 A.L.R.4th 555 (1981) (treating the two types of coverage as similar). Noska's act of placing live embers in uncovered barrels is analogous to Woodrich's positioning the turntable, while Noska's transporting uncovered barrels filled with live embers is analogous to Woodrich's motioning the dumptruck to back up. In short, each injury resulted from the concurrence of a vehicle-related and a nonvehicle-related act. *Woodrich* dictated in 1958 that, in such circumstances, recovery be allowed under both policies. Since that time, other states have also reached the same conclusion.

4. In *Tlougan v. Auto-Owners Ins. Co.*, 310 N.W.2d 116 (Minn.1981), we held that the injury did not arise from use of an automobile, and, as a result, the automobile liability policy did not afford coverage. In the last sentence of the opinion, we stated that as a result of our holding, the homeowner's policy would provide coverage, because its automobile exemption was inapplicable. Although we implied that only one coverage—either homeowner's or automobile—could ever apply to a given accident, we were not faced with two independent causes.

In *State Farm Automobile Mutual Ins. Co. v. Partridge,* 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973), the insured had modified his pistol to possess a "hair trigger." While hunting rabbits from his automobile, the insured rested the gun on the steering wheel. When the automobile hit a bump, the gun discharged, causing injury. The homeowner's insurer and the automobile liability insurer each denied coverage. The California Supreme Court perceived that two acts—one vehicle-related and one nonvehicle-related—were involved. The court began its discussion of the case by stating:

Initially, we shall point out that coverage is unquestionably available under the automobile liability policy since the instant accident bore some causal relationship to the use of the insured vehicle. Thereafter, we shall explain that although the homeowner's policy excluded injuries "arising out of the use" of an automobile, such exclusion does not preclude coverage when an accident results from the concurrence of a non-auto-related cause and an auto-related cause. The comprehensive personal liability coverage of the homeowner's policy affords the insured protection for liability accruing generally from non-auto-related risks. Whenever such a non-auto risk is a proximate cause of an injury, liability attaches to the insured, and coverage for such liability should naturally follow. Coverage cannot be defeated simply because a separate excluded risk constitutes an additional cause of the injury. We therefore conclude that the trial court properly found that coverage is available under both of the policies in question.

10 Cal.3d at 97, 109 Cal.Rptr. at 813, 514 P.2d at 125. The court's analysis is reflected in the following quotations:

Here the "use" of Partridge's car was not the sole cause of Vanida's injuries but was only one of two joint causes of the accident. Thus, even if we assume that the connection of the car with the accident is the type of non-ambiguous causal relationship which would normally bring the exclusionary clause into play, the cru-

cial question presented is whether a liability insurance policy provides coverage for an accident caused jointly by an insured risk (the negligent filing of the trigger mechanism) and by an excluded risk (the negligent driving). Defendants correctly contend that when two such risks constitute concurrent proximate causes of an accident, the insurer is liable so long as one of the causes is covered by the policy.

In issuing the homeowner's policy to Partridge, State Farm agreed to protect the insured against liability accruing from non-auto-related risks. The insurer does not deny that Partridge's negligence in filing the trigger mechanism of his gun was a risk covered by the homeowner's policy; thus, if the gun had accidentally fired while the insured was walking down the street or running through the woods, the insurer admits that any resultant damage would clearly be covered by the policy. The insurer contends, nonetheless, that coverage is foreclosed here because the present accident arose out of the use of an automobile.

In the instant case, however, although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries. Under these facts the damages to Vanida are, under the language of the homeowner's coverage clause, "sums which the Insured * * * [became] legally obligated to pay" because of the negligent filing of the trigger mechanism; inasmuch as the liability of the insured arises from his non-auto-related conduct, and exists independently of any "use" of his car, we believe the homeowner's policy covers that liability.

\*    \*    \*    \*    \*    \*

In sum, in purchasing two separate insurance policies from State Farm, the insured obtained coverage for liabilities arising from different sources. Under the homeowner's policy, the insurer agreed to protect the insured against liability arising generally from non-auto-re-

lated risks; under the automobile policy the insurer guaranteed indemnity arising from auto-related risks. Since the injury and the insured's liability in the instant case resulted from both auto-related and non-auto-related causes, the insurer is liable under both policies.

10 Cal.3d at 102–103, 106, 109 Cal.Rptr. at 817, 820, 514 P.2d at 128, 132.

The Wisconsin Supreme Court faced the identical issue in *Lawver v. Boling,* 71 Wis.2d 408, 238 N.W.2d 514 (1976). Lawver, a visitor to Boling's farm, agreed to help him attach boards to the side of a barn. The men rigged a lift chair to hoist Lawver into position. The lift consisted of a rope running up to a pulley and attached to Boling's vehicle; as the vehicle was moved away, Lawver would be lifted into position. Lawver was injured when the rope snapped as Boling drove the vehicle. Boling was insured under a farmowner's policy and an automobile liability policy.

The Wisconsin Supreme Court held that the automobile liability policy clearly afforded coverage, because the vehicle was part of the apparatus used to repair the barn. The court then faced the issue whether the farmowner's policy could also afford coverage if part of Boling's negligence was connected with his choice of materials for, and the manner of construction of, the rigging. Because it had not been determined in the trial court whether Lawver's injuries resulted from the non-automobile-related risk, the court remanded the case for determination of the issue. The court cited *Partridge* as an instance in which a covered risk and an excluded risk concurred in causing the injury and stated:

> It is apparent that the insurer, under such circumstances is not being held to provide coverage for a risk which it did not contemplate and for which it received no premium. Indeed, it would appear to

be unfair to the insured to deny benefits he has paid for.

\*    \*    \*    \*    \*    \*

We conclude [the homeowner's insurer] should not be excused from its obligation to defend the action or pay benefits until it has been determined that the injuries did not result, *even in part,* from a risk for which it provided coverage and collected a premium.

\*    \*    \*    \*    \*    \*

The objective of this approach is to provide coverage under both policies. 71 Wis.2d at 422–423, 238 N.W.2d at 521–522. (Emphasis supplied.) The Wisconsin court then explicitly adopted the analysis of *Partridge.*[5]

We find the rule of *Woodrich Construction* and the reasoning of the above-cited courts to be compelling. Here, the homeowner's insurer agreed to pay for liability accruing to Noska which arose from nonautomobile-related causes and accepted a premium for assuming this risk. The trial judge found, and we agree, that the act of placing live embers in an uncovered barrel with other debris was a cause of the fire and was nonautomobile-related. The homeowner's policy should cover this risk, without regard to the intervention of another contributing cause which admittedly was not covered. As the California court stated in *Partridge,* "Coverage cannot be defeated simply because a separate excluded risk constitutes an additional cause of the injury." 10 Cal.3d at 97, 109 Cal.Rptr. at 813, 514 P.2d at 125.

## II.

■ 3. Having concluded that the homeowner's policy affords coverage, the next, more difficult, issue is the amount of coverage available, an issue which results from conversations, negotiation, and amendment of the policy contemporaneous with the fire itself.

---

5. The same analysis and conclusion have been adopted by the Supreme Court of Louisiana, see *LeJeune v. Allstate Ins. Co.,* 365 So.2d 471, 479 (La.1978); *Sherville v. National U. Fire Ins. Co.,* 387 So.2d 1181, 1183 (La.App.1980), and by the Illinois Appellate Court, see *U.S. Fidelity* *& Guar. Co. v. State Farm Mut. Auto. Ins. Co.,* 63 Ill.Dec. 14, 107 Ill.App.3d 190, 437 N.E.2d 663, 667 (1982). These opinions offer further support for our decision, although we deem it unnecessary to recount them in detail.

Three days following the fire, Noska was contacted by a special investigator for the Minnesota Department of Natural Resources (DNR) who was seeking to determine the cause of the fire. The investigator read *Miranda* warnings to Noska, who waived his right to silence and talked freely about the accident.

The pre-existing homeowner's policy was effective from April 18, 1977, to April 18, 1980, thus expiring 3 days before the fire. The policy provided $100,000 of coverage for personal liability. On April 26, 1980, 2 days after talking to the DNR investigator, Noska reviewed his insurance papers. His testimony, credited by the trial court in its findings, was that it was his practice periodically to review the policies to be certain the premiums had been paid, that he had no knowledge that his homeowner's policy might cover the accident, and that he was not reviewing the policy to see if he was covered, because he believed it only covered accidents occurring on his property. Waseca Mutual contended Noska was in fact reviewing his policy to see if the fire was a covered occurrence.

In any event, Noska discovered on April 26 that the policy premiums had not been paid to renew the policy after April 18, 1980. That evening, Noska called his insurance agent, who said the press of business had kept him from contacting Noska about renewing the policy, and claimed there was a 30-day grace period to renew. Waseca Mutual acknowledges that no notice of intent not to renew had been given to Noska, and concedes that, pursuant to Minn.Stat. § 65A.29 (1982), the $100,000 of coverage afforded by the initial policy continued in effect.

On Monday, April 28, the agent met Noska at his father's store. As the trial judge found, the agent brought up the idea of increasing the policy limits for personal liability from $100,000 to $300,000. Noska thereupon asked that the coverage be increased to $300,000; he also raised the coverage for damage to his home.

The agent, on his own initiative, backdated the new policy with the $300,000 limit to April 18, 1982, thus effective 3 days *before* the fire. Noska did not ask him to backdate the policy, nor, Noska testified, did the agent tell Noska he intended to do so. The agent testified that he believed he did tell Noska, but that he was not certain that he did so. The agent knew of the fire, but he did not know that Noska was involved. The agent asked Noska various questions incident to renewing the policy, but none of them related to the fire. Noska said nothing to the agent about the fire or the interview with the DNR.

The trial court found and concluded that the renewal and increase of policy limits were sought by Noska in good faith, that Waseca Mutual failed to prove that Noska had committed any fraud in obtaining the increase, and that Waseca Mutual was bound by the action of its agent who backdated the policy on his own initiative. The ultimate conclusion of the trial court was that $300,000 of coverage was available.

■ We cannot hold that the trial court's findings of fact, based upon the credited testimony of Noska, were so lacking in evidentiary support as to be clearly erroneous. We conclude, however, that the ruling of the trial court that $300,000 coverage was effective as to these fire losses was erroneous as a matter of law. We hold that the backdated policy was not effective to provide increased coverage for these fire losses, because the finding of the trial court negativing fraud on Noska's part necessarily precludes a finding of the meeting of the minds essential to formation of a contract of insurance. This conclusion is an implicit corollary to our prior cases in which we discussed fraud on the part of an insured in procuring his policy.[6]

---

6. Waseca Mutual urges us to deny the increase in coverage based on the last clause of Minn. Stat. § 60A.08, subd. 9 (1982), which provides:

No oral or written misrepresentations made by the assured, or in his behalf, in the negotiation of insurance, shall be deemed material, or defeat or avoid the policy, or prevent its attaching, unless made with intent to deceive or defraud, *or unless the matter misrepresented increases the risk.*

Three past cases have dealt with the issue of alleged fraud in the procurement and backdating of insurance. The oldest, still authoritative and directly on point, is *Wales v. New York Bowery Fire Ins. Co.,* 37 Minn. 106, 33 N.W. 322 (1887). There, Cheney, an agent for an insurance company, insured plaintiff's wood under a policy which expired on May 13, 1885. Cheney, sometime before the policy expired, left the insurer's employ, and became an agent of New York Bowery. About noon on May 15, 1885, the wood was destroyed by fire. Shortly thereafter, plaintiff, not knowing the wood was destroyed, applied to Milligan & Ermentrank, insurance agents in Minneapolis, for insurance on the wood. As they had no company in which they could carry the risk, they (still on May 15) took plaintiff's request to Cheney's office; he learned of the application at 4 p.m. By this time, plaintiff knew the wood had burned. Cheney also was unable to write the policy in the blanket form requested by plaintiff. On May 18, Cheney went to plaintiff's office, negotiated terms, and wrote two policies covering the wood; he had no notice that the wood had burned. He then dated the policies back to May 13, 1885, knowing plaintiff's previous policy expired on that date; his purpose, he testified, was "to make the insurance continuous." After the policies were delivered to plaintiff, Cheney learned the wood had been destroyed.

We held that Cheney had not assumed the risk until May 18, when he wrote the two policies for plaintiff. We reasoned that:

> (Emphasis added).
> Previous cases have established that if the material misrepresentation increases the risk of loss, the policy is avoided regardless of the intent with which it was made. *Preferred Risk Mut. Ins. Co. v. Anderson,* 277 Minn. 342, 344, 152 N.W.2d 476, 479 (1967); *Nielsen v. Mutual Service Cas. Ins. Co.,* 243 Minn. 246, 249, 67 N.W.2d 457, 459 (1954). Neither of these cases involved a misrepresentation made after the loss, however, and hence they are distinguishable.
> We believe the cited clause of the statute was intended to cover situations in which a misrepresentation is made before the loss occurs,

As in the case of any other contract, to constitute a contract of insurance, the parties' minds must meet and concur as to terms. * * *

> If [on May 18] *both* parties had been ignorant of the loss, it would have been competent for them, by antedating the policy, to have made it retroactive. But in fact the plaintiff then knew that the property had been destroyed, but did not communicate that fact to defendant's agent, who, in ignorance of the loss, accepted the risk, and issued the policy. Under these circumstances, the policy is void, and does not cover the loss.

37 Minn. at 108–109, 33 N.W. at 323.

Ten years later, in *Nippolt v. Fireman's Ins. Co. of Chicago,* 57 Minn. 275, 59 N.W. 191 (1894), we held no coverage existed where the loss occurred a few days after the policy expired, and the agent, when contacted by the insured, issued a new policy antedated to the expiration of the old policy. The insured concealed the loss from the agent in order to obtain the new policy. We stated: "[I]t was a fraud on [insured's] part thus to enter into such a contract after the loss, knowing that loss and failing to disclose it to the other party to the contract, whom he knew was ignorant of it, and thereby procure that other party to insure him against a loss which had already occurred." 57 Minn. at 278, 59 N.W. at 192.

The most recent case is *Oster v. Riley, supra,* in which the issue was whether a workers' compensation insurance policy was in effect at the time of an employee's heart attack. Riley, a contractor about to commence his first independent construction

> which is material to the risk which the insurer will bear after the policy is applied for and issued. Insurance cannot be issued for a known loss. *Oster v. Riley,* 276 Minn. 274, 287, 150 N.W.2d 43, 52 (1967) (Otis, J., dissenting). Once the loss has occurred, there is no longer any "risk." Hence, where the loss has occurred prior to the application for insurance, the relevant question is not whether the "risk" was increased, but whether the parties, particularly the insured, knew of the loss at the time of application, since that knowledge would be nearly conclusive evidence as to bad faith. Therefore, the "increase the risk" prong of Minn.Stat. § 60A.08, subd. 9, is inapplicable.

job, hired Oster, who began working at 9 a.m. on September 11. At about 10:30 a.m. Oster sustained acute coronary thrombosis which caused his death. Sometime during that morning, Riley called his insurance agent and ordered workers' compensation coverage; Riley consistently testified that he placed the call about 9:45 a.m., *before he discovered the accident.* The agent did not call the underwriter until 1:30 p.m. that day, at which time the policy was written to be effective at 12:01 a.m. on September 11, some 10 hours before Oster's heart attack.

The Industrial Commission accepted Riley's version of the facts, and ruled that coverage existed. We found evidence in the record to support the factual determination, and affirmed. The significant legal issue was whether Riley had a duty to notify the agent of the accident, after making the initial telephone call and obtaining an oral binder, but before the agent ordered the policy from the underwriter. We held that there was no duty to do so where Riley could and did reasonably believe that coverage existed from the time of his initial call. But we also reaffirmed the holding of *Wales* that "an insurer is protected from liability upon a predated insurance policy if it appears that the insured concealed his knowledge of a loss at a time he knew the insurance had not yet been effected." 276 Minn. at 280, 150 N.W.2d at 48.

In this case, Noska clearly did know the fire had occurred. If he had known or intended that the increase in coverage would be backdated, these precedents would compel the conclusion that he engaged in fraud. The trial court, however, held that no fraud can be attributed to him, based squarely on a finding of fact that Noska had no such knowledge or intent.

Subject to the statutory law of the state, a policy of insurance is within the application of general principles of the law of contracts. *St. Paul School District No. 625 v. Columbia Transit Corp.,* 321 N.W.2d 41, 45 (Minn.1982); *Bobich v. Oja,* 258 Minn. 287, 104 N.W.2d 19 (1960). Thus, the concept of legal relations between an applicant for insurance and the insurance company is essentially the same as that between parties negotiating other contracts. *St. Paul School District No. 625,* 321 N.W.2d at 45; *LaFavor v. American National Ins. Co.,* 279 Minn. 5, 155 N.W.2d 286 (1967). In *Wales,* which both parties cited to us, we stated one aspect of contract law which applies to insurance: "As in the case of any other contract, to constitute a contract of insurance, *the parties' minds must meet and concur as to terms.*" 37 Minn. at 108, 33 N.W. at 323 (emphasis added).

Noska is impaled on the horns of a dilemma: if he intended the policy would be backdated, his conduct would have been fraudulent. But unless he intended the policy to be backdated, there was no meeting of the minds to do so. The question was put directly to Noska: "And you didn't intend to obtain additional coverage at that time for any claim that might have been made against you by reason of this fire, did you?" He testified in response, "No, I did not." No reason exists to give Noska that which he neither intended nor bargained to receive. The increased coverage must be construed to have been in effect from April 28, 1980, to April 28, 1981. The judgment of the district court is modified to limit Waseca Mutual's liability under the homeowner's policy to $100,000.

Affirmed in part as modified; reversed in part.

SIMONETT, J., took no part in the consideration or decision of this case.